RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0012p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

KENNETH SADLER (19-2217/2221); DEMARCO TEMPO (20-1177),

*Defendants-Appellants*.

┐
│
│
│
├  Nos. 19-2217/2221/20-1177
│
│
│
┘

───────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
Nos. 2:16-cr-20414; 2:18-cr-20221—Sean F. Cox, District Judge.

Argued:  October 26, 2021

Decided and Filed:  January 21, 2022

Before:  DAUGHTREY, COLE, and CLAY, Circuit Judges.

───────────────

## COUNSEL

───────────────

**ARGUED:**  David M. Burgess, Dearborn, Michigan, for Appellant  Kenneth Sadler.  Phillip D. Comorski, Detroit, Michigan, for Appellant Demarco Tempo.  Daniel R. Hurley, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.  **ON BRIEF:**  David M. Burgess, Dearborn, Michigan, for Appellant  Kenneth Sadler.  Phillip D. Comorski, Detroit, Michigan, for Appellant Demarco Tempo.  Amanda Jawad, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

───────────────

## OPINION

───────────────

CLAY, Circuit Judge.  Defendants Demarco Tempo and Kenneth Sadler challenge the judgments in their criminal cases after a jury convicted them on various drug, gun, and

obstruction of justice charges. Defendant Demarco Tempo appeals his convictions and sentence on a drug conspiracy charge under 21 U.S.C. §§ 841(b)(1)(A)–(C), 846; drug possession and distribution charges under § 841(a)(1), (b)(1)(C); and a drug possession and distribution near a school charge under §§ 841, 860. Defendant Kenneth Sadler challenges his convictions and sentence on a drug conspiracy charge under 21 U.S.C. §§ 841(b)(1)(A)–(C), 846; a drug possession and distribution near a school charge under §§ 841, 860; a felon in possession of a firearm charge under 18 U.S.C. § 922(g)(1); a conspiracy to obstruct justice charge under § 1512(k); and witness tampering charges under § 1512(a)(2)(A). For the reasons discussed below, we **AFFIRM** Tempo's convictions and sentence, **AFFIRM** Sadler's convictions, but **VACATE** Sadler's sentence, and **REMAND** for a new trial on the sole question of whether Sadler was within the chain of distribution as required before imposing an enhanced sentence under 21 U.S.C. § 841(b)(1)(C).

## I. BACKGROUND

### A. The "Polo" Operation

Between 2012 and 2016, people in east Detroit could buy heroin and crack cocaine at all hours of the day and night by calling one of two different phone numbers and going to a set location where they would meet someone to buy drugs. Those who used this drug dealing system called it "Polo." (*See* Jamie Dabish Trial Test., R. 705, Page ID #3943, #3959; Marko Tomic Trial Test., R. 721, Page ID #5662; David Grzywacz Trial Test., R. 722, Page ID #5855).[1]

The Warren City Police Department—in conjunction with the Drug Enforcement Administration ("DEA") and the Federal Bureau of Investigation ("FBI")—began investigating "Polo" in 2016. The investigation led to a large takedown operation. Law enforcement arrested thirteen "Polo" members, and the government charged them with multiple drug trafficking

---

[1]This appeal arises from two separate cases in the Eastern District of Michigan, Nos. 2:16-cr-20414 and 2:18-cr-20221. The cases were joined for trial. Unless otherwise noted, citations to the record refer to the consolidated docket for all Defendants in Case No. 2:16-cr-20414. There are a small number of citations to the record in the separate, but related, case against only Kenneth Sadler, Case No. 2:18-cr-20221. Citations to that record will provide the case number.

offenses.  Most Defendants pleaded guilty.  Only Tempo and Sadler proceeded to trial.  The trial lasted nineteen days, and the witnesses included "Polo" customers, law enforcement officers, paramedics, acquaintances, medical and forensic experts, and one of the alleged co-conspirators (and co-Defendants).  The government also introduced physical evidence from surveillance operations and property searches.  This evidence tells the story of a sophisticated and well-organized drug trafficking scheme called "Polo."  The government alleges that Tempo led this operation and that Sadler—Tempo's half-brother—participated.

1.  Customer Testimony

Ten "Polo" customers testified at Defendants' trial.  Each bought drugs from "Polo" many times—some hundreds of times, and often multiple times a day.  They each described buying drugs from "Polo" in the same way.  First, customers called one of two phone numbers: one ending in x3399, the other ending in x5598.  Customers "could call th[ose] phone[s] . . . 24/7," and they were "always available."  (Olivia Palazzola Trial Test., R. 715, Page ID #5369).  Many customers said that the same person "[u]sually, but not always" answered the phone.  (Jennifer Pointer Trial Test., R. 717, Page ID #5533; *see also* Dan Magda Trial Test., R. 722, Page ID #5898 (stating the same person answered "[m]ost of the time"); Hannah Fenn Trial Test., R. 715, Page ID #5275 (stating "it sounded like the same person" who answered, and that "maybe once or twice somebody else had answered")).  However, a few believed that different people answered the phones.  Some customers called and asked for "Polo" or called the person who answered "Polo."  But the person answering did not identify himself, and customers never met anyone who introduced himself as "Polo."  Even so, customers understood "Polo" to mean "one person."  (Pointer Test., R. 717, Page ID #5530).

On this first call, the person who answered the phone directed the customer to a meeting spot, usually one of five locations in east Detroit:  Hamburg Street, Dresden Street, the intersection of Bradford Avenue and Bringard Drive, the intersection of Seven Mile Road and Gratiot Avenue, or the intersection of Eight Mile Road and Hoover Road.  At the meeting spots, cars often "lined up" waiting to buy drugs.  (Tomic Test., R. 721, Page ID #5665).  Once the customer arrived, a "runner" would approach her.  (Christina Yako Trial Test., R. 723, Page ID ##5990–91).  Runners were people who "went around and sold the drugs for whoever was in

charge." (Pointer Test., R. 721, Page ID #5603; *see also* Yako Test., R. 723, Page ID #5990 (describing a "runner" as the one who "comes out and gives the drugs real quick, and just . . . goes back in")). Customers met different runners depending on when and where they bought drugs. Sometimes the runner had the drugs on him, but sometimes he went "around the corner of a [vacant] house . . . and then [he] would come ba[ck] with the drugs." (Grzywacz Test., R. 722, Page ID #5860). Runners were usually alone and often on foot. Occasionally, however, the runner would be in a van or car when approaching the customer. If the runner was in a car, he was usually with two or three other people.

After a runner approached the customer, the customer placed an order. If the customer wanted heroin, she asked for "boy," and if she wanted crack cocaine, she asked for "girl." (Palazzolo Test., R. 715, Page ID #5345; Dabish Test., R. 705, Page ID #3958). The drugs were packaged in small plastic bags about 0.5 to 1.5 inches in size, and each small bag cost $20. Sometimes the runner took the small bag of drugs out of a larger "sandwich bag that had . . . little bags in it." (Pointer Test., R. 717, Page ID #5537). After serving a customer, the runner "would walk up to the next car or walk back where they came from." (Palazzolo Test., R. 715, Page ID #5351).

One runner, Amacio Alexander, testified at Defendants' trial. In May or June 2016, a man known as "Mr. Howard" recruited Alexander to sell drugs. (Amacio Alexander Trial Test., R. 705, Page ID ##4032–35). Alexander's job was to stand on Hamburg Street and "[s]ell a little product." (*Id.* at Page ID #4040). On a typical day, he sold drugs to about 50 customers. Mr. Howard gave him the drugs to sell in a sandwich bag with about 50 small, prepackaged bags of drugs. Alexander usually sold three or four sandwich bags—roughly 150 to 200 small, individual bags—each day. He sold each bag for $20, and, when he ran out, Mr. Howard found him, took the money from earlier sales, left, and returned with a replenished bag of drugs.

2. Undercover Purchases

As early as 2013, the FBI began investigating drug trafficking activity on the east side of Detroit in connection with the name "Polo." As part of this investigation, the FBI set up two undercover purchases using a confidential informant. On January 29, 2013, the informant called

the x3399 phone number and was directed to Gratiot Avenue and Whittier Street.  He bought three bags—0.175 grams—of heroin for $55.  On November 1, 2013, the informant called the x3399 number again and was directed to a house on Hamburg Street. The informant bought two small bags—0.14 grams—of heroin for $40.

Between April 19, 2016, and June 14, 2016, Officer David Villerot with the Warren City Police Department carried out eighteen more undercover purchases.  He bought drugs from "Polo" in the same way as all the other "Polo" customers.  Officer Villerot or his informant called the x3399 number; met runners at different places including Hamburg Street and the intersection of Bringard and Bradford; asked for certain drugs—for example, "two boy;" and paid $20 for each small plastic bag of drugs.  (David Villerot Trial Test., R. 709, Page ID #4529, #4539, ##4545–46, #4572, #4582).

3.  Nature of the Substances

"Polo" sold both heroin and crack cocaine.  In early 2016, customers started noticing a change in "Polo's" heroin.  Until then, the heroin was "brownish," (Randy Odish Trial Test., R. 717, Page ID #5429), or "light gray," (Tomic Test., R. 721, Page ID #5668).  But in early 2016, the heroin changed color; it was lighter—"like a light beige . . . [or] an off-white color." (Palazzola Test., R. 715, Page ID #5359).  Customers also noticed that the texture changed; the heroin was now more "powder[y]," (Fenn Test., R. 715, Page ID #5279), or "crystally," (Tomic Test., R. 721, Page ID #5677), when it previously came as a "chunk" and was more rock-like, (Grzywacz Test., R. 722, Page ID #5862; Haggart Test., R. 722, Page ID #5785).  One customer was so confused by the sudden change in the heroin's appearance that he called the x3399 "Polo" number back and said, "I wanted heroin, not crack," to which the person answering said, "This is heroin."  (Odish Test., R. 717, Page ID ##5437–38, #5440).  "Polo" customers and street-level dealers called this lighter drug "White China," (Dabish Test., R. 705, Page ID #3969), "kill shit," (Villerot Test., R. 709, Page ID #4554; Fenn Test., R. 715, Page ID #5279), or "Russian white," (Yako Test., R. 723, Page ID #5978).

This lighter, powdery heroin was more potent.  Noticing the change in potency, customers were no longer "sure how much [they] could do or how much [they] would need for

the day." (Palazzola Test., R. 715, Page ID #5353). One customer reacted differently to this heroin; she became ill and vomited after using it. Some suspected that this lighter heroin contained fentanyl. One "Polo" runner told a customer that this heroin was "good stuff" because it was cut with fentanyl. (Magda Test., R. 722, Page ID #5910).

As part of the ongoing investigation, police ran several laboratory tests on "Polo" drugs. These tests showed that sometimes "Polo" sold pure heroin. In sixteen out of eighteen undercover purchases, Officer Villerot bought pure heroin from "Polo." But sometimes "Polo's" heroin was cut with fentanyl. On April 19, 2016, Officer Villerot bought 0.23 grams of a substance containing "detectable amounts of heroin and fentanyl," (Villerot Test., R. 709, Page ID #4548), and on March 17, 2016, a customer bought drugs from "Polo" that contained "detectable amounts of fentanyl and heroin," (Pointer Test., R. 721, Page ID #5583). Sometimes "Polo" sold pure fentanyl. On May 30, 2016, Officer Villerot bought 0.28 grams of pure fentanyl from "Polo." On March 30, 2016, police seized 0.028 grams of pure fentanyl from a "Polo" customer. And on March 29, 2016, police seized 0.107 grams of pure fentanyl from a "Polo" customer.

### 4. Overdoses

Around the same time that customers noticed a difference in "Polo's" heroin, law enforcement officers and paramedics noticed an uptick in opioid overdoses in Warren, Michigan. Many of the witnesses had overdosed—or saw friends overdose—on "Polo's" drugs. Some overdosed on the lighter, more potent heroin. The charges against Tempo and Sadler involve five overdoses by four different victims.

### a) *Christina Yako*

Christina Yako overdosed on February 20, 2016. Randy Odish testified that he was with Yako that night and that they called the x3399 number to buy heroin. Phone records confirmed that Odish called the x3399 number that night. The heroin they bought was lighter in color and "look[ed] different." (Yako Test., R. 723, Page ID #5976; Odish Test., R. 717, Page ID #5438). They went back to Odish's house and used the drugs. Yako did not mix her drugs with anything, but she had used Xanax earlier that day. Odish used the drugs first, and he warned Yako not to

do too much because they were very strong.  Immediately after Yako injected the drugs, she "passed out;" she "could hardly breathe," "[h]er lips [turned] bluish-purple," and "she [began] bleeding from her mouth." (Odish Test., R. 717, Page ID ##5443–44).  Odish then called the police.

When the paramedics arrived, they found Yako face-down in a pool of vomit.  Her fingertips and lips were blue, and she was taking only four to six breaths per minute—a rate which is not life-sustaining.  The paramedics administered Narcan[2] intranasally, at which point Yako began breathing more rapidly, her vitals improved, and the paramedics transported her to the hospital.  At the hospital, doctors administered a second dose of Narcan—this time intravenously—and Yako became fully alert.  The hospital did not give her a urinalysis or blood toxicology test.  The government's expert witness, Dr. Mills, testified that Yako's medical condition was consistent with an opioid overdose—either on heroin or fentanyl—and that, without medical attention, she would have died.

### b) David Grzywacz

David Grzywacz overdosed on February 26, 2016.  He said he bought the drugs from "Polo."  Phone records showed that he called the x5598 "Polo" number eight times that day.  The only time Grzywacz noticed a difference in "Polo's" heroin was on the day he overdosed when the drug appeared powdery and lighter.  He used the heroin immediately after purchasing it, and the next thing he remembers is waking up in an ambulance.

The paramedics found him in the passenger seat of a car at a gas station.  When they arrived, they suspected an opioid overdose.  At that time, Grzywacz was taking only four breaths per minute.  The paramedics moved him into the ambulance and administered Narcan intravenously.  Grzywacz responded well to the Narcan; his breathing returned to normal, and the paramedics transported him to the hospital.  The hospital did not give him a urinalysis or blood toxicology test. Dr. Mills testified that Grzywacz's  medical condition was consistent with an opioid overdose and that he likely would have died without medical intervention.

---

[2]Narcan is like an anti-venom for opioids.  It reverses the effects of opioid poisoning.  The government's expert witness, Dr. Kirk Mills, testified that a positive response to Narcan is "basically confirmation" that the patient had overdosed on an opioid.  (Kirk Mills Trial Test., R. 703, Page ID #3865).

*c) Jennifer Pointer*

Jennifer Pointer overdosed twice, first on March 17, 2016, and again on March 30, 2016. Before either of her own overdoses, Pointer saw her friend, Dawn Boose, overdose on heroin from "Polo."[3]   On February 19, 2016, Pointer bought heroin from "Polo" for her boyfriend, Boose, and herself.  The heroin she bought looked lighter than usual.  After snorting an entire $20 bag of heroin, Boose's lips began turning blue, and her skin turned a gray color.  Police and paramedics arrived, revived Boose, seized the remaining heroin that the group had not used, and arrested Pointer.  Lab tests showed that the drugs had a detectable amount of both heroin and fentanyl.

On March 17, 2016—St. Patrick's Day—Pointer called the x3399 number and bought heroin from "Polo."  The evidence did not contain Pointer's phone records from that day, but she remembered buying drugs at the intersection of Bradford and Bringard.  She said she did not buy drugs from any other dealer or use any other drugs that day.  The heroin she bought was lighter than usual and "looked the same" as it did on February 19, 2016—when Boose overdosed. (Pointer Test., R. 721, Page ID #5588).  She snorted an entire $20 bag of heroin with her boyfriend.

She woke up "violently ill" with paramedics surrounding her.  (*Id.* at Page ID #5590). When the paramedics arrived, she was unresponsive and barely breathing with paraphernalia around her.   Paramedics administered two doses of Narcan—one intranasally and one intravenously.  She became responsive after the second dose, walked to the ambulance herself, and was lucid when the paramedics transported her to the hospital.  At the hospital, her doctors gave her a urine drug screen, which was positive for opiates and cocaine.  But Dr. Mills testified that Narcan would have worked only if Pointer overdosed on opiates; it would not reverse a cocaine overdose.   Dr. Mills concluded that this overdose was consistent with a heroin or fentanyl overdose and that, without medical treatment, it was "[m]ore likely than not [that] she would have died."  (Mills Test., R. 703, Page ID #3873).

---

[3]The charges against Defendants do not involve Boose's overdose, but the facts of this incident provide useful background for Pointer's later overdoses.

Pointer overdosed again on March 30, 2016.  This time she used Boose's phone to call the x3399 "Polo" number because she did not have a phone at that time.  Boose's phone records showed three calls to the x3399 number that day.  The drugs she bought this time were "light, but not white" like they were when Boose overdosed.  (Pointer Test., R. 721, Page ID #5594).  She and Boose used the drugs in a parking lot before driving to a nearby pain center.  Boose snorted an entire $20 bag, while Pointer snorted one-half of a $20 bag.  While Pointer was driving, Boose began to moan, and her lips turned blue.  Pointer turned into the pain center parking lot and called 9-1-1.

When police arrived, they searched Pointer and found "the other half of [her] bag of heroin" that she bought that day.  (*Id.* at Page ID #5597).  Officer Steiber—one of the police officers who responded to the scene—testified that, when he searched Pointer, he found "a small fold paper, which is consistent with the packaging for heroin."  (Jeffrey Steiber Trial Test., R. 717, Page ID ##5504–06).  Officer Steiber seized the substance, and test results concluded that it was 0.028 grams of pure fentanyl, which is "nine to ten times the lethal dose of fentanyl to your average adult."  (Mills Test., R. 703, Page ID #3877).  Steiber handcuffed Pointer and put her in the back of the squad car.  He walked away from the car momentarily, and, when he returned, he found Pointer unconscious with shallow breathing.  The paramedics administered two doses of Narcan—one intranasally and one intravenously.  After the second dose, "she became responsive almost immediately."  (Steiber Test., R. 717, Page ID ##5510–11).

Pointer was taking Suboxone and Adderall at the time of both overdoses.  At the hospital, Pointer's urinalysis drug screen tested positive for amphetamines, cannabinoids, and cocaine— but not opiates.  Even so, Dr. Mills said that Pointer's responsiveness to Narcan indicated that she overdosed on opioids and that, unlike heroin, fentanyl "is not detected by that particular [urinalysis] drug screen."  (Mills Test., R. 703, Page ID ##3874–75, ##3877–78).  He said that the cocaine and amphetamines (Adderall) "played no role" in her overdose.  (*Id.* at Page ID #3878).  Dr. Mills did not offer an opinion on whether Suboxone contributed to either overdose, but he did say that Suboxone would not appear on a urine drug test.  Dr. Mills concluded that Pointer's second overdose was "consistent with an opioid poisoning" and that, without medical attention, "she could have died."  (*Id.* at Page ID #3875, #3878).

### d) Anoosh Baghdassarian

Anoosh Baghdassarian died on March 30, 2016, at 19 years of age.  Baghdassarian's friend, Marko Tomic, said that he and Baghdassarian bought heroin from "Polo" the day before she died.[4]  Tomic testified that he drove to Baghdassarian's house, she came outside and got into his car, they called "Polo," and then they went to buy heroin near Six Mile Road in Detroit.  They then returned to Baghdassarian's house.  Tomic used the drugs in his car outside Baghdassarian's house, but Baghdassarian did not use her drugs immediately; rather, she took them inside with her.  After Tomic used the drugs, he fell asleep in front of Baghdassarian's house.  When he awoke, he began driving home.  The police stopped him and arrested him for possession of a controlled substance.  They seized the drugs that Tomic bought earlier that day with Baghdassarian, and lab results showed that they were pure fentanyl.

At trial, Baghdassarian's mother, Yvonne Baghdassarian, remembered that day somewhat differently.  She recalled Marko Tomic—whom she called "Markos"—coming to their home around 4:30 p.m.  (Yvonne Baghdassarian Trial Test., R. 721, Page ID #5648).  But she said that, when he pulled up, she and Baghdassarian were in their car about to leave to take Baghdassarian's brother to work.  When Tomic arrived, Baghdassarian asked her mother to "just give [her] a minute."  (*Id.*)  Baghdassarian walked to Tomic's car, got inside, and "la[id] down under his window talking to him."  (*Id.*)  After a few minutes, she got back in the car with her mother.  In an earlier statement to police, Yvonne said that Tomic arrived at their home around 3:30 p.m. and that Baghdassarian left with him for roughly one hour between 3:30 and 4:30 p.m.

---

[4]The phone records do not show any calls to the x5598 or the x3399 number from either Baghdassarian's or Tomic's phone on March 29, 2016.  Between March 31, 2015, and March 6, 2016, phone records revealed 903 contacts between Tomic's number and the x5598 and x3399 numbers.  But there were no contacts between Tomic and those numbers after March 6, 2016.  Baghdassarian had two different phone numbers during the relevant period.  Between September 8, 2015, and February 14, 2016, there were 259 contacts between her two phones and the two "Polo" phones.  But neither of Baghdassarian's phone numbers had any contacts with the "Polo" phones after February 14, 2016.

But these "contacts" showed only phone calls and text messages, (Robert Witt Trial Test., R. 791, Page ID #8000), and one of Baghdassarian's friends testified that Baghdassarian sometimes used an application on her phone to make phone calls.  The phone data that investigators collected would not reflect any communication between Baghdassarian and the target phones that was conducted over a phone application—such as WhatsApp, GroupMe, or Facebook Messenger—rather than through a direct telephone call or text message.

However, at trial, Yvonne denied ever making that statement and said that Baghdassarian never left with Tomic.

After Tomic left, Baghdassarian left with her mother. They dropped off her brother and picked up food from a McDonald's restaurant before returning home around 9:00 p.m. Shortly thereafter, she told her mother that she was not feeling well and went to bed. Her mother stayed awake until 3:00 a.m. and twice saw Baghdassarian come out of her room to get water. Her mother left around 7:00 a.m. the next morning to pick up Baghdassarian's brother from work. Around 9:00 a.m., Yvonne saw Baghdassarian in the kitchen eating leftover food from McDonald's. But Baghdassarian subsequently went back to bed. When Yvonne went to check on Baghdassarian around 1:00 p.m., she found Baghdassarian face down on the floor and called 9-1-1. Between 9:00 p.m. on March 29 and 1:00 p.m. on March 30, Yvonne never saw Baghdassarian leave the house, never saw anyone come to the house, never saw Baghdassarian meeting anyone, and never saw anyone giving her anything.

Officer Accivetti responded to the 9-1-1 call and found Baghdassarian in a cluttered bedroom and believed, upon seeing her, that she was already dead. He saw "a syringe near the deceased body on the floor, as well as a cigarette pack containing a bottle cap and some residue inside of it." (Michael Accivetti Trial Test., R. 721, Page ID #5721). He said that these items are "commonly used to mix narcotics in, to inject inside the needle." (*Id.* at Page ID #5722). These items were not taken into evidence or tested because Officer Accivetti did not collect them, believing that an evidence technician would do so.

When paramedics arrived, they found Baghdassarian pulseless and breathless. They attempted to revive her with Narcan, but they were unsuccessful, and doctors declared her dead when she arrived at the hospital. The medical examiner's blood toxicology report found 11 nanograms of fentanyl per milliliter of blood and 15 nanograms of alprazolam (Xanax) per milliliter of blood. Three nanograms of fentanyl per milliliter is considered a fatal dose. The medical examiner testified that Baghdassarian's Xanax levels were "less than therapeutic"—or less than a safe prescription dosage—and concluded that she died of a fentanyl overdose. (Bernardine Pacris Trial Test., R. 723, Page ID #6047).

5. Demarco Tempo's Involvement with "Polo"

Tempo was widely known by the nickname "Polo." It started as "Marco Polo" but became just "Polo" over the years. (William Dennis, Sr. Trial Test., R. 713, Page ID #5179). As early as 2009, William Dennis, Sr.—the father of Tempo's half-brother—saw Tempo cut up heroin, place it in small plastic bags, bundle those small bags together, and package them "into a sandwich bag for sale." (*Id.* at Page ID ##5134–35, ##5140–41). Dennis also saw Tempo selling crack cocaine as early as 2013. Indeed, Dennis used to cook crack cocaine with Tempo, which Tempo later sold.

Amacio Alexander—a "Polo" runner—identified Tempo in open court as the man to whom his boss, Mr. Howard, answered. Alexander interacted with Tempo a few times while selling drugs on Hamburg Street. The first time, Tempo turned to Alexander and told him that selling drugs "is grown-men business." (Alexander Test., R. 705, Page ID #4038). The second time, Alexander handed the money from his drug sales directly to Tempo. Finally, Tempo gave Alexander a phone to use while selling drugs, and Tempo called that phone to tell Alexander when customers were coming.

Other witnesses saw Tempo when they bought drugs from "Polo." During three undercover purchases in 2016, Officer Villerot saw Tempo driving the car as a passenger made the drug sales. Once, Officer Villerot saw the passenger hand Tempo the money from the sale. Phone tracking data put Tempo at the location of this deal at that time. Officer Villerot also identified Tempo's voice in recorded calls from the FBI's 2013 undercover purchases and his 2016 undercover purchases.

As early as 2009, Tempo listed his personal phone number as the x5598 "Polo" number. Tempo often carried two phones in his hands, and geolocation data showed that the x5598 phone and the x3399 phone were always together. Using geolocation data, police officers located the phones and used that information to pull Tempo over as he was driving home from a trip to Chicago. When Tempo got back from Chicago, officers tracked the phones as they stopped at each suspected "Polo" stash house "like clockwork." (Craig Bankowski Trial Test., R. 708, Page ID #4427).

Witnesses said Tempo's phone was always ringing, with calls coming in every minute. After taking a call, he would "tell one of the other guys around to go meet somebody somewhere." (Dennis Test., R. 713, Page ID #5158). Tempo occasionally entrusted the phones to "certain people," but he was selective about who he trusted for this task. (*Id.* at Page ID #5163). When officers arrested Tempo on June 14, 2016, they found both the x3399 and the x5598 phones in the center console of his car. The phones "wouldn't stop ringing" and "consistently rang" until an officer turned them off. (Villerot Test., R. 710, Page ID ##4683–84).

On June 14, 2016, officers searched various properties that had ties to "Polo" drug deals and to Tempo personally.

*15431 Spring Garden*. Tempo bought this property from William Dennis. The DEA searched it and found a digital scale with white residue, large and small plastic bags, razor blades with white residue, and "other drug packaging material." (Kevin Dailey Trial Test., R. 711, Page ID ##4859–61).

*19504 Strasburg*. This house was seemingly vacant; no utilities ran to it, and it had a "for rent" sign out front. (Bankowski Test., R. 708, Page ID #4410). It is located within 1000 feet of a school. In 2014 and again in early 2016, Tempo paid Dennis to do some repairs on the property. While working, Dennis often saw Tempo in the house with other people. At times, Dennis saw large quantities of drugs and people packaging drugs into small plastic bags. Once, when Tempo was at the house, Dennis saw someone put a substance into his mouth, taste it, and then spit it out, saying: "That's that fentanyl, I don't want none of that shit." (Dennis Test., R. 713, Page ID #5171). Tempo responded by saying: "That's that strong[;] [t]hat's what everybody want." (*Id.*)

Investigators said the house was a "Polo" "stash location" that operated "almost like a dispatch center." (Bankowski Test., R. 708, Page ID #4352, #4357). Surveillance showed Tempo at the property "at least once a day." (*Id.* at Page ID #4413). "Polo" members and runners—those involved in "hand-to-hand drug transactions," (*id.* at Page ID #4363)—frequently came and went from the property. When officers searched it, they found: 16.7 grams of cocaine

in a nickel-sized plastic bag, 138.3 grams of crack cocaine on a plate, a digital scale, razor blades, and plastic bags with white powder residue.

*24343 Flower*.  On May 23, 2016, during a traffic stop, Tempo told police that he resided at this home with a woman named Tachelle Harris.  When officers searched the house on June 14, 2016, they found 379.8 grams of cocaine in a plastic bag with Tempo's fingerprints on it. The bag was in a shoebox under the bed in the master bedroom.  Officers also found two digital scales in a cabinet and court documents with Tempo's name on them.

*12634 Hamburg*.  "Polo" often sold drugs on Hamburg Street.  A police informant bought drugs there as early as November 1, 2013, and Officer Villerot bought drugs there as late as May 30, 2016.  When customers went to Hamburg, they were sometimes told to park in front of, or even go inside, a blue house to buy drugs.  On one occasion, "one of the people in the ["Polo"] organization" told a "Polo" customer, who was experiencing withdrawal symptoms, that she could go inside the house to use the heroin she bought.  (Palazzola Test., R. 715, Page ID #5357).  That customer used drugs in the house many times between late 2015 and early 2016, and she said that the house was vacant.  When officers searched the property on June 14, 2016, they found digital scales, drug packaging materials, clear plastic bags, multiple dishes with suspected drug residue, and razor blades.

6. Kenneth Sadler's Involvement with "Polo"

Sadler's involvement with the drug scene traces back to 2009, when William Dennis saw Sadler with Tempo as Tempo cut heroin.  Between 2009 and 2010, and again in 2015, Sadler told Dennis that "he could give [Dennis] the good heroin."  (Dennis Test., R. 713, Page ID #5146).  In 2012, an informant working with the Sterling Heights Police Department set up two undercover purchases and bought $120 worth of heroin from Sadler.  Sadler met the informant in a Meijer parking lot in Sterling Heights.  He showed up in a car driven by a woman with children in the back seat.  The police arrested Sadler for these sales.  The Sterling Heights investigation was a "short term investigation;" it was not a part of a larger "Polo" investigation, and the officer did not know what phone number had been called to set up the deal.  (Jason Modrzejewski Trial Test., R. 706, Page ID ##4279–81).

Alexander never saw Sadler involved with "Polo" deals or with Alexander's drug sales on Hamburg Street.  When Dennis saw Tempo send runners to meet customers, Tempo never sent Sadler.  Sometime in 2009 or 2010, Dennis saw Sadler arguing with Tempo for control of the "Polo" phones and customer base.  Dennis also saw Sadler get angry when Tempo entrusted other people, but not Sadler, with more responsibility within "Polo" operations.

On June 14, 2016, police arrested Tempo and found both phones.  But one day later, the police received an "updated GPS ping" on the x3399 phone, showing that the phone tied to that number was no longer in the police station but was now at 15652 Eastburn.  (Villerot Test., R. 711, Page ID ##4932–34).  Officer Villerot called the x3399 number, trying to set up another undercover purchase.  A person answered the phone and directed him to a location.  But when Officer Villerot called the x3399 number after he arrived, the person directed him to a different location.  After repeating this process two or three times, Officer Villerot abandoned the operation.

While Officer Villerot was trying to set up a purchase, other officers were surveilling the 15652 Eastburn house.  They saw a man leave the house and get into a black Escalade.  Police stopped that vehicle and found Sadler driving.  Geolocation data put the x3399 number at the same location during the traffic stop.  Officer Villerot called the x3399 number and saw the phone in the center console of the car ringing with Officer Villerot's phone number displayed as the caller.  The same process identified the x5598 phone in the center console.  Officers then arrested Sadler.

Earlier surveillance of "Polo" operations saw the same black Escalade—identified by its VIN and license plate number—near various "Polo" drug deals.  When police searched the 15652 Eastburn house, they found a digital scale—which is "commonly used for the weighing or separating of narcotics for prepackaged sales," (Nicholas Lienemann Trial Test., R. 713, Page ID #5088)—a large bag with drug residue, sandwich bags, Noscapine—which is a popular heroin cutting agent—and a firearm and ammunition.  Forensic testing found Sadler's DNA on the firearm.  Sadler's children lived in this house with their mother, and officers found documents and other evidence indicating that Sadler resided there.

**B. Witness Tampering**

Two days after Sadler's arrest on June 15, 2016, the court released him on bond.  On June 19, 2016, Sadler approached Alexander while Alexander was at his aunt's house.  Sadler drove up to the house in a black truck and, without getting out of the vehicle, approached Alexander and said, "Take back what you said.  Don't go to court or your family going to see your face on a T-shirt."   (Alexander Test., R. 705, Page ID #4064).   Alexander believed this referred to "memorial T-shirt[s]" and believed it was a death threat.  (*Id.*)  The geolocation data on Sadler's phone confirmed that he was near Alexander's aunt's house around the time of this incident.

On March 23, 2018, Sadler's attorney—Doraid Elder—gave Sadler the witness list in this case and reviewed grand jury testimony with him, including testimony from William Dennis.  Around that time, Francine Leatherwood, Dennis' mother, got a phone call from Sadler and his mother, Sheila Frill.  Leatherwood knew them both well and recognized their voices.  During the call, Sadler and Frill told Leatherwood that Dennis agreed to testify against Tempo and Sadler.  They did not ask her to do anything, and they did not threaten her.  After four to five minutes, Leatherwood ended the conversation by telling Sadler and Frill that she could not control her son and there was nothing she could do if Dennis wanted to testify.  "[R]ight after" that phone call ended, Leatherwood got another call from a person whose voice she did not recognize.  (Francine Leatherwood Trial Test., R. 791, Page ID ##7875–76).  When she answered, the caller said, "Tell William to shut up or one of y'all are going to go missing."  (*Id.* at Page ID #7875).  The caller then immediately hung up.

Within a few days of this call, Sadler sent Andrea Leatherwood, Dennis' sister, a Facebook message stating:  "That's crazy how your brother are main witness, but we telling on him.  Little bro turn in his grave, that's how shit . . . ."  (Andrea Leatherwood Trial Test., R. 791, Page ID ##7883–84, ##7890–91).   She discussed the incident with her mother, Francine Leatherwood, and they realized that the Facebook message and phone call came just days apart.  At that point, they notified the police about the messages and calls.

**C. Procedural Background**

A grand jury indicted Sadler and Tempo—along with several other co-Defendants—on drug and firearm-related offenses.  Based on Sadler's conduct while released on bond, the government brought additional charges against him for witness tampering and obstruction of justice.  Sadler and Tempo proceeded to trial on all counts.  Before trial, the district court denied Sadler's motion to exclude the testimony of his former attorney, Doraid Elder.  At trial, the court overruled Sadler's objections concerning evidence of two drug sales to an undercover Sterling Heights police officer in 2012.

At the close of the government's evidence, both Defendants moved for judgments of acquittal under Federal Rule of Criminal Procedure 29.  The district court reserved ruling on the motions until after trial, and ultimately denied both motions.

The jury convicted Tempo on seven counts:  one count of drug conspiracy under 21 U.S.C. §§ 841(b)(1)(A)–(C), 846; five counts of drug possession and distribution under § 841(a)(1), (b)(1)(C); and one count of drug possession and distribution near a school under §§ 841, 860.  The court sentenced him to 30 years of imprisonment.  The jury convicted Sadler on six counts:  one count of drug conspiracy under 21 U.S.C. §§ 841(b)(1)(A)–(C), 846; one count of drug possession and distribution near a school under §§ 841, 860; one count of possessing a firearm as a convicted felon under 18 U.S.C. § 922(g)(1); one count of conspiracy to obstruct justice under 18 U.S.C. § 1512(k); and two counts of tampering with witnesses under 18 U.S.C. § 1512(a)(2)(A).  The court sentenced him to 20 years of imprisonment for the drug conspiracy and distribution offenses, 10 years of imprisonment for the firearm offense, and 5 years of imprisonment for the obstruction of justice charges.

On both Defendants' conspiracy charges, the jury found that the crimes "resulted in the death . . . [and] serious bodily injury of another person." (Def. Tempo Jury Verdict, R. 665, Page ID #3629; Def. Sadler Jury Verdict, R. 667, Page ID #3643).  On Tempo's drug distribution charges, the jury found that one count "resulted in . . . death" and four counts "resulted in . . . serious bodily injury." (Def. Tempo Jury Verdict, R. 665, Page ID ##3629–31).

Several months later, both Defendants filed motions for a new trial, which the district court denied.  Both Defendants filed timely notices of appeal to this Court.

## II.  DISCUSSION

Defendants raise multiple challenges to their convictions and sentences.  First, both argue that their convictions were not supported by sufficient evidence.  Second, Sadler raises two evidentiary challenges.  Third, both Defendants claim that the district court gave erroneous jury instructions.  Finally, Tempo argues that he was sentenced under an unconstitutionally vague sentencing provision.

## A.  Sufficiency of the Evidence

In challenges under Federal Rule of Criminal Procedure 29, we review "*de novo* the sufficiency of the evidence to sustain a conviction."  *United States v. Emmons*, 8 F.4th 454, 477 (6th Cir. 2021) (quoting *United States v. Gunter*, 551 F.3d 472, 482 (6th Cir. 2009)).  When a defendant also argues that he was entitled to a new trial under Federal Rule of Criminal Procedure 33, the district court's decision "is reviewed for abuse of discretion and granted only 'in the extraordinary circumstances where the evidence preponderates heavily against the verdict.'"  *United States v. LaVictor*, 848 F.3d 428, 455–56 (6th Cir. 2017) (quoting *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007)).

Under Rule 29, notwithstanding the jury verdict, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  "[A] defendant claiming insufficiency of the evidence bears a very heavy burden."  *Emmons*, 8 F.4th at 478 (quoting *United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006)).  "In reviewing the sufficiency of the evidence, the relevant inquiry is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id.* at 477–78 (quoting *United States v. Wallace*, 597 F.3d 794, 800 (6th Cir. 2010)).  "All reasonable inferences must be made to support the jury verdict."  *LaVictor*, 848 F.3d at 456 (citing *United States v. Wettstain*, 618 F.3d 577, 583 (6th Cir. 2010)).  "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable

hypothesis except that of guilt." *Id.* (quoting *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999)). When considering the sufficiency of the evidence, we cannot "reweigh the evidence, reevaluate the credibility of witnesses, or substitute [our] judgment for that of the jury." *Emmons*, 8 F.4th at 478 (quoting *United States v. Callahan*, 801 F.3d 606, 616 (6th Cir. 2015)). Defendants challenge each of their convictions.

1. Drug Conspiracy

Both Defendants argue that their conspiracy convictions under 21 U.S.C. §§ 841 and 846 were not supported by sufficient evidence. Those sections prohibit conspiracies to distribute a controlled substance or possess a controlled substance with the intent to distribute. §§ 841(a)(1), 846. "[T]o sustain a conviction for drug conspiracy under section 846, the government must prove beyond a reasonable doubt: (1) an agreement to violate drug laws; (2) knowledge of and intent to join the conspiracy; and (3) participation in the conspiracy." *United States v. Williams*, 998 F.3d 716, 728 (6th Cir. 2021) (quoting *United States v. Gardner*, 488 F.3d 700, 710 (6th Cir. 2007)). "An agreement can be tacit, not formal, and the 'government may meet its burden of proof through circumstantial evidence.'" *Id.* (quoting *United States v. Layne*, 192 F.3d 556, 567 (6th Cir. 1999)). In § 846 conspiracy cases, "circumstantial evidence that may establish that 'a drug sale is part of a larger drug conspiracy' includes advance planning, ongoing purchases or arrangements, large quantities of drugs, standardized transactions, an established method of payment, and trust between the buyer and seller." *Id.* (quoting *United States v. Deitz*, 577 F.3d 672, 680–81 (6th Cir. 2009)).

For starters, the jury could have found beyond a reasonable doubt that each "Polo" drug deal was "part of a larger drug conspiracy." *Williams*, 998 F.3d at 728. "Polo" drug deals required significant advance planning. Drugs were individually packaged and prepared in advance so that runners could make multiple sales before needing to replenish their stock. When customers called either "Polo" phone, they were directed to a specific location where a runner was nearby or waiting for them. "Polo" continuously sold drugs for many years. Customers often bought drugs from "Polo" hundreds of times over the course of three to four years. The sales were standardized. Indeed, customers used nearly identical procedures to buy drugs from "Polo." "Polo" also handled large quantities of drugs. A single "Polo" runner would sell

between 150 and 200 individual bags of drugs *each day*.  The method of payment was consistent; each individual plastic bag of heroin consistently cost $20, and customers paid the runner in cash each time.  Finally, customers found "Polo" to be a reliable system, and both the person answering the "Polo" phones and the runners came to recognize loyal customers.

Even though the evidence sufficiently showed that the "Polo" conspiracy existed, the government still had to prove that each Defendant joined that conspiracy.  "[O]nce the existence [of] a conspiracy is shown, the evidence linking an individual defendant to that conspiracy need only be slight." *United States v. Caver*, 470 F.3d 220, 233 (6th Cir. 2006) (citing *United States v. Henley*, 360 F.3d 509, 514 (6th Cir. 2004)).  We address each Defendant in turn.

### a) Demarco Tempo

The evidence sufficiently showed that Tempo was a member of the "Polo" conspiracy. Tempo went by the nickname "Polo," and two insider witnesses testified that Tempo led all "Polo" operations.  Dennis saw Tempo package and prepare drugs for sale.  Tempo controlled the "Polo" phones.  Records tie him to the x5598 "Polo" number as early as 2009.  Geolocation data puts the x5598 phone, the x3399 phone, and Tempo in the same place on multiple occasions, and police found both of those phones in Tempo's car when they arrested him.  The only way that customers could buy drugs from "Polo" was by calling one of those two phones. Dennis saw Tempo answer his phones and immediately send runners to meet customers.  While some customers said that multiple people answered the "Polo" phones, many said the same person answered most of the time.  The same person answered each time Officer Villerot called to set up an undercover buy, and Villerot later identified that speaker as Tempo.  The jury could have weighed this evidence and concluded that Tempo personally controlled those phones, the key to "Polo's" success.

Witnesses also saw Tempo at the scene during some sales.  One saw a runner hand money from a drug deal directly to Tempo.  Alexander said that he did that himself.  Tempo oversaw runners in other ways too.  Tempo gave Alexander a phone to use for drug deals and told him that selling drugs was "grown-men business."  (Alexander Test., R. 705, Page ID #4038).  Even if Tempo never engaged in the hand-to-hand drug deals himself, the evidence

sufficiently supports a finding that Tempo agreed with others—including runners and customers—to violate drug laws and that he knew about and participated in the "Polo" conspiracy. Tempo makes three specific arguments challenging this finding. Each is meritless.

First, he argues that the government's evidence "showed the existence of multiple conspiracies, not a single conspiracy as charged in the indictment." (Def. Tempo Br. at 25). He argues that this mismatch between the indictment and the evidence was a prejudicial variance. Because Tempo did not raise this argument at trial, we review this allegation of a variance for plain error. *Caver*, 470 F.3d at 235. "A variance to the indictment occurs when the charging terms of the indictment are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *Id.* "Within the context of a conspiracy, a variance constitutes reversible error only if a defendant demonstrates that he was prejudiced by the variance and that the 'indictment allege[d] one conspiracy, but the evidence can reasonably be construed *only* as supporting a finding of multiple conspiracies.'" *Id.* at 235–36 (alteration in original) (quoting *United States v. Warner*, 690 F.2d 545, 548 (6th Cir. 1982)). "We 'review the evidence as to the number of conspiracies in the light most favorable to the government, considering 'the existence of a common goal, the nature of the scheme, and the overlapping of the participants in various dealings.'" *Williams*, 998 F.3d at 730 (quoting *United States v. Williamson*, 656 F. App'x 175, 183 (6th Cir. 2016)).

Tempo asks us to focus on the relationship between him and the customers. He argues that this case presents a "rimless" wheel-and-spoke conspiracy "in which various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's involvement in each transaction." (Def. Tempo Br. at 26–27 (quoting *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203 (4th Cir. 2002))). But "[a] single conspiracy does not become multiple conspiracies simply because each member of the conspiracy did not know every other member, or because each member did not know of or become involved in all of the activities in furtherance of the conspiracy." *Caver*, 470 F.3d at 236 (quoting *Warner*, 690 F.2d at 549). Tempo's argument ignores middlemen and runners like Mr. Howard and Alexander—with whom Tempo coordinated. Even if each "Polo" member did not know every other member or participate in

every aspect of the conspiracy, the evidence sufficiently shows that "Polo" operations were interdependent and relied on a steady customer base, runners and middlemen, and higher-ups to answer the "Polo" phones, ensure runners had sufficient supplies, and choose the locations for deals. Thus, the jury could have found, beyond a reasonable doubt, that there was a single conspiracy to distribute and sell controlled substances based on evidence of "a regular pattern of distribution for a large quantity of drugs." *Caver*, 470 F.3d at 236.

Second, Tempo argues that he never conspired to distribute fentanyl in particular. But this proposition is both factually and legally flawed. Legally, "knowledge and intent to join the conspiracy includes that the defendant 'was aware of the object of the conspiracy and that he voluntarily associated himself with it to further its objectives." *Williams*, 998 F.3d at 729 (quoting *United Sates v. Hodges*, 935 F.2d 766, 772 (6th Cir. 1991)). "[T]he government need not prove mens rea as to the type and quantity of the drugs in order to establish a violation of §§ 841 and 846." *Id.* (internal quotation marks omitted) (quoting *United States v. Villarce*, 323 F.3d 435, 439 & n.1 (6th Cir. 2003)). Therefore, even if Tempo was not personally aware that "Polo" was selling fentanyl, or cutting heroin with fentanyl, evidence showed that he "conspired to violate drug laws," even if he did not conspire to distribute fentanyl specifically. *See Williams*, 998 F.3d at 728–29. Factually, the evidence showed that Tempo *did* know that "Polo" sold fentanyl. Dennis testified that—while doing repairs for Tempo at a suspected stash house—someone put a substance in his mouth and spit it out, saying, "That's that fentanyl, I don't want none of that shit." (Dennis Test., R. 713, Page ID #5171). Tempo responded by saying, "That's that strong[;] [t]hat's what everybody want." (*Id.*) We will not reweigh the weight and credibility of Dennis' testimony, *see Emmons*, 8 F.4th at 478, and a rational jury could have relied on his testimony to conclude that Tempo *was* aware that "Polo" laced heroin with fentanyl or sold pure fentanyl.

Finally, at base, Tempo asks us to reweigh the evidence and reevaluate the witnesses' credibility. Tempo highlights that Dennis and Alexander only testified to get lesser sentences in their own criminal cases and that "the rewards for these individuals were so substantial that they could not help but conform their testimony to the government's theory of the case." (Def. Tempo Br. at 29). He further suggests that Officer Villerot's voice-identification testimony—

identifying Tempo as the person answering the x3399 number during eighteen controlled purchases in 2016 and two controlled purchases in 2013—was not reliable because Officer Villerot had "only two brief contacts with Mr. Tempo and no expertise in voice identification." (*Id.* at 28). But "determining the credibility of witnesses is a task for the jury, not this court." *United States v. Beverly*, 369 F.3d 516, 532 (6th Cir. 2004) (citing *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993)); *see also United States v. Eaton*, 784 F.3d 298, 305 (6th Cir. 2015) (refusing to entertain the defendant's argument that the jury should not have relied on inconsistent testimony from two "admitted perjurers" because "[t]he jury was entitled to believe the trial testimony of the two [witnesses]").

### b) Kenneth Sadler

Although a closer call, sufficient evidence also supported Sadler's conspiracy conviction. Sadler argues that no rational jury could have found beyond a reasonable doubt that he knew about and intended to join the "Polo" conspiracy or that he participated in that conspiracy. "Knowledge and participation can be inferred from the defendant's conduct, but mere association with members of the conspiracy is not enough to support such an inference." *United States v. Martinez*, 430 F.3d 317, 334 (6th Cir. 2005) (citing *United States v. Pearce*, 912 F.2d 159, 162 (6th Cir. 1990)). "To be sure, knowledge and intent to join the conspiracy includes that the defendant 'was aware of the object of the conspiracy and that he voluntarily associated himself with it to further its objectives.'" *Williams*, 998 F.3d at 729 (quoting *Hodges*, 935 F.2d at 772). The defendant must be aware of the conspiracy's "ultimate purpose." *Id.* (quoting *United States v. Sliwo*, 620 F.3d 630, 633 (6th Cir. 2010)). In a sprawling drug conspiracy like "Polo," "it is enough to show that each member of the conspiracy realized that he was participating in a joint venture, even if he did not know the identities of every other member, or was not involved in all the activities in furtherance of the conspiracy." *Martinez*, 430 F.3d at 332–33.

As discussed above, there is sufficient evidence demonstrating the existence of a "Polo" conspiracy. The question as to Sadler is whether there was even a "slight" connection tying him to that conspiracy. *See Caver*, 470 F.3d at 233 ("[O]nce the existence [of] a conspiracy is shown, the evidence linking an individual defendant to that conspiracy need only be slight."

(citing *Henley*, 360 F.3d at 514)).   A rational jury could have found that Sadler knew the "ultimate purpose" of the conspiracy—to sell controlled substances—and that he intended to join and participated in the conspiracy.   As early as 2009—before the start of the alleged conspiracy—Dennis saw Sadler with Tempo as Tempo cut up heroin and packaged it for sale. Evidence also showed that Sadler *wanted* to be involved with "Polo."  At times, Sadler got angry when Tempo entrusted other people, but not Sadler, with more responsibility within "Polo" operations, and Sadler fought with Tempo over control of the "Polo" phones and customer base. This evidence shows Sadler's agreement with "Polo" members and his intent to join the conspiracy.

Evidence also showed that Sadler actually participated in the conspiracy.  After police arrested Tempo on June 14, 2016, geolocation data showed that the x3399 "Polo" number moved to 15652 Eastburn, an address that Sadler often visited (and possibly where he resided), and where his children lived with their mother.  When Officer Villerot called the x3399 number trying to set up another undercover purchase on June 15, 2016, a man answered the phone and directed Officer Villerot to a location.  Ultimately, Officer Villerot abandoned this undercover purchase.   Around the same time, officers saw Sadler leave the Eastburn house in a black Escalade that officers had previously seen near "Polo" drug sales.  Officers pulled Sadler over and found both "Polo" phones in the car.  When police searched the 15652 Eastburn residence, they found a digital scale, a large bag with drug residue, sandwich bags, Noscapine—which is a popular heroin cutting agent—documents with Sadler's name on them, and a firearm and ammunition.  The jury heard evidence that these objects are commonly associated with drug trafficking.[5]   While these facts may not be enough, standing alone, to support the jury's conviction, together, this evidence shows that Sadler sought out more involvement and leadership within "Polo" and that he attempted to take over "Polo" operations after many "Polo"

---

[5]The government also points to evidence from two undercover drug purchases involving Sadler in 2012. During a "short term investigation," an informant with the Sterling Heights Police Department bought $120 worth of heroin from Sadler.  (Modrzejewski Test., R. 706, Page ID #4279, #4286).  Sadler argues that this evidence was inadmissible.  As discussed below, the district court abused its discretion by admitting this evidence. *See infra* Part II.B.1.  Ultimately, however, there was sufficient evidence of Sadler's involvement in the conspiracy even absent this fact.

members were arrested on June 14, 2016. Combined, this amounts to sufficient evidence supporting the jury's verdict.

Sadler's arguments do not undermine these key facts. Sadler points out that Alexander never saw Sadler involved with any "Polo" deals, and Tempo never used Sadler as a runner. But this evidence does not mean that Sadler could not have knowingly and intentionally joined the "Polo" conspiracy, nor does it preclude his involvement in other ways. *See Martinez*, 430 F.3d at 332–33. The combination of Sadler's desire for leadership within "Polo," his possession of drug trafficking paraphernalia, and his possession of the "Polo" phones provided sufficient evidence for the jury to conclude beyond a reasonable doubt that Sadler was a co-conspirator.

2. Drug Distribution Causing Serious Bodily Injury or Death

Tempo next argues that there was insufficient evidence to support his five charges under 21 U.S.C. § 841(a)(1), (b)(1)(C). He raises two issues in this regard: (1) whether he can be held liable for every "Polo" drug distribution under § 841(a), and (2) whether "Polo" drugs caused the death and injuries of the four overdose victims as required under § 841(b)(1)(C).

*a) Distribution*

Section 841(a)(1) prohibits the knowing or intentional distribution, or possession with the intent to distribute, of a controlled substance. 21 U.S.C. § 841(a)(1). There is no dispute that heroin, fentanyl, and crack cocaine are controlled substances. *See* § 812. As the district court instructed, there were three ways the government could have proven that Tempo was guilty of this crime:

> The first is by convincing [the jury] that [Tempo] committed or participated in this crime. The second is by showing that [Tempo] aided and abetted the commission of the charged offense. The third is based on the legal rule that all members of a conspiracy are responsible for acts committed by the other members, as long as those acts are committed to help advance the conspiracy, and are within the reasonably foreseeable scope of the agreement. This is often called "Pinkerton Liability."

(Jury Instrs., R. 662, Page ID #3580). Sufficient evidence would allow a jury to conclude, beyond a reasonable doubt, that Tempo was liable under any of these three theories.

First, the facts show that Tempo acted as a principal—meaning a jury could have found him personally liable for distributing "Polo" drugs.  The applicable statute defines "distribute" as "to deliver," which in turn "mean[s] the actual, constructive, or attempted transfer of a controlled substance . . . , whether or not there exists an agency relationship."  21 U.S.C. § 802(8), (11).  "Although distribution may involve the actual or constructive possession of a controlled substance, 'distribution' includes other acts perpetrated in furtherance of a transfer or sale, such as arranging or supervising the delivery, or negotiating for or receiving the purchase price."  *United States v. Colon*, 268 F.3d 367, 377 (6th Cir. 2001).  "Although it may be unusual for a person to distribute a controlled substance without at least momentarily possessing the controlled substance, it is not impossible."  *Id.* (quoting *United States v. Jackson*, 213 F.3d 1269, 1296–97 (10th Cir. 2000)); *see also United States v. Waller*, 503 F.2d 1014, 1015–16 (7th Cir. 1974) (finding constructive transfer when a mother told her daughter to hand the drugs to the buyer).

Under this theory, the jury could have found that Tempo constructively distributed all of the drugs "Polo" sold because he planned and coordinated "Polo" drug deals.  Tempo answered the "Polo" phones to set up buys; Tempo told runners to go meet customers; witnesses identified Tempo as the head of the "Polo" operation; and Tempo gave runners phones to use while selling drugs.  This evidence sufficiently shows that Tempo led "Polo" operations and constructively participated in all "Polo" sales.  Moreover, distribution accounts for the actions of agents.  *See* 21 U.S.C. § 801(8).  Thus, a jury could have found Tempo directly responsible for drug sales that "Polo" members conducted on Tempo's behalf or at his behest.

Second, the jury could have found Tempo liable for aiding and abetting "Polo" drug sales.  "To prove that [a defendant] aided and abetted drug transactions . . . the government must establish that [he] participated in the venture as something [] he wished to bring about and sought to make succeed."  *Williams*, 998 F.3d at 735 (quoting *United States v. Ward*, 190 F.3d 483, 487 (6th Cir. 1999)).  For the same reasons listed above, the jury could have found, beyond a reasonable doubt, that Tempo aided and abetted each "Polo" sale, including sales to the overdose victims.

Finally, the jury could have concluded that Tempo was liable as a co-conspirator under *Pinkerton v. United States*, 328 U.S. 640 (1946).  "The *Pinkerton* doctrine permits conviction of

a conspirator for the substantive offenses of other conspirators committed during and in furtherance of the conspiracy." *United States v. Martin*, 920 F.2d 345, 348 (6th Cir. 1990). "The doctrine holds that a member of a conspiracy is liable for 'substantive offense[s]' committed by his co-conspirators, even if he did not participate in them, as long as: (1) the offenses are 'done in furtherance of the conspiracy,' (2) they 'fall within the scope of the unlawful project,' and (3) they are reasonably foreseeable 'consequence[s] of the unlawful agreement.'" *United States v. Hamm*, 952 F.3d 728, 744 (6th Cir. 2020) (quoting *Pinkerton*, 328 U.S. at 647–48). Certainly, "Polo" drug sales meet these requirements; the entire point of "Polo" was to sell drugs. As discussed above, the jury's conclusion that Tempo was a member of the "Polo" conspiracy was also supported by sufficient evidence. Therefore, under each of these three theories, a rational jury could have found beyond a reasonable doubt that Tempo was liable for each "Polo" sale— including the sales to the overdose victims.

### b) Resulting in Death or Serious Bodily Injury

While § 841(a)(1) states the offense, § 841(b)(1)(C) imposes an enhanced sentence. Section 841(b)(1)(C) imposes a 20-year mandatory minimum sentence if a defendant violates § 841(a)(1) and "death or serious bodily injury results from the use of [the distributed] substance." § 841(b)(1)(C). The death-or-injury-results enhancement "is an element that must be submitted to the jury and found beyond a reasonable doubt." *Burrage v. United States*, 571 U.S. 204, 210 (2014) (citing *Alleyne v. United States*, 570 U.S. 99, 115–16 (2013)). In *Burrage*, the Supreme Court held that, "at least where use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death or serious bodily injury, a defendant cannot be liable under the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C) unless such use is a but-for cause of the death or injury."[6] *Id.* at 218–19. "[B]ut-for causation exists where use of the controlled substance 'combines with other factors to

---

[6]"An independently sufficient cause is not quite the same thing as a but-for cause." *Hamm*, 952 F.3d at 738 n.3 (citing Antony Honoré & John Gardner, *Causation in the Law*, Stanford Encyclopedia of Philosophy (Winter 2010 ed.), https://plato.stanford.edu/archives/win2010/entries/causation-law/). Although suggesting that an independently sufficient cause would satisfy the "results from" requirement, the Supreme Court in *Burrage* did not address that question. *See Burrage*, 571 U.S. at 210. Here, there is likely sufficient evidence that heroin and/or fentanyl were sufficient independent causes of the victims' overdoses. Even so, there is also sufficient evidence that those substances were the but-for cause of the victims' overdoses. Thus, we need not reach the issue of independent sufficient cause at this time. *See Hamm*, 952 F.3d at 738 n.3.

produce' death [or serious bodily injury], and death [or serious bodily injury] would not have occurred 'without the incremental effect' of the controlled substance." *United States v. Volkman*, 797 F.3d 377, 392 (6th Cir. 2015) (quoting *Burrage*, 571 U.S. at 211). The government does not need to prove that the defendant directly delivered the drug to the injured or deceased person or even that a co-conspirator handed the drug to that person. *United States v. Davis*, 970 F.3d 650, 656 (6th Cir. 2020). Rather, "[t]he statute requires the government to prove only that the specific drug underlying a defendant's violation of § 841(a) is the same drug that was the but-for cause of the victim's death." *Id.* The causation inquiry thus has two parts for each victim: (1) did the victim use "Polo" drugs, and (2) were those drugs the but-for cause of the victim's overdose.

Before turning to these victim-specific questions, Tempo argues that the government cannot establish causation without a blood test identifying the substances in the victim's body at the time of the overdose. Of the four overdose victims involved here, only one—Anoosh Baghdassarian—received a blood toxicology test,[7] and only one received a urine toxicology test. The district court rejected this argument and concluded that "there is no legal requirement that blood tests be admitted to establish that a serious bodily injury or death resulted from the use of a substance distributed by Tempo." *United States v. Tempo*, No. 16-cr-20414, 2019 WL 5896138, at *2 (E.D. Mich. Nov. 12, 2019) (citing *Cockrell v. United States*, No. 14-cv-175, 2017 WL 1088339, at *3 (E.D. Tex. Mar. 22, 2017)). We likewise decline to adopt a bright-line rule that but-for causation under § 841(b)(1)(C) requires evidence from blood toxicology tests. This is a matter of first impression before us, but our sister circuits have found but-for causation in overdose cases even without blood tests. *See United States v. Harris*, 966 F.3d 755, 759, 762 (8th Cir. 2020) (finding but-for causation based on victims' testimony and recollection); *United States v. Lewis*, 895 F.3d 1004, 1006–07, 1009 (8th Cir. 2018) (finding but-for causation based on medical expert testimony and lab-tested paraphernalia found at the scene). Only the Fifth Circuit has directly addressed this question. *United States v. Cockrell*, 769 F. App'x 116, 118 (5th Cir. 2019). In *Cockrell*, the Fifth Circuit found that, even despite "the lack of medical testing of the victims," the victims' positive reactions to Narcan showed that they overdosed on

---

[7]The hospital ran a blood test on Jennifer Pointer, but it was not a blood toxicology test. Her doctors ran standard blood tests because she had pneumonia at the time. Dr. Mills relied on Pointer's urinalysis tests—not the blood tests—to determine what drugs were in her system.

opioids. *Id.* We agree with this conclusion. The absence of blood tests here does not undermine the jury's finding that "Polo" drugs caused the victims' overdoses. We must therefore determine whether sufficient evidence showed that each victim used "Polo" drugs and that those drugs caused the victim's overdose. We have already presented many of the relevant facts. *See supra* Part I.A.4.

### i. Count 3: Christina Yako

Sufficient evidence supported the jury's conclusion that Yako overdosed on drugs she bought from "Polo." She and her friend, Randy Odish, both testified that they bought heroin from "Polo" on February 20, 2016, shortly before Yako overdosed. Phone records showed that Odish called the x3399 number that evening. Immediately after using those drugs, Yako "passed out," "[h]er lips [turned] bluish-purple," and "she [began] bleeding from her mouth." (Odish Test., R. 717, Page ID ##5443–44). When the paramedics arrived, she was taking only six breaths per minute, which is not life-sustaining. The paramedics and the doctors at the hospital administered two doses of Narcan, at which point Yako became fully alert. Dr. Mills testified that her medical condition was consistent with an opioid overdose—either heroin or fentanyl—and, without medical attention, she would have died.

In arguing that this evidence is insufficient, Tempo highlights that Odish's memory was clouded by past drug use, that he was a convicted felon, and that he had previously lied to law enforcement. He also highlighted inconsistencies in Yako's testimony about whether she or Odish called the "Polo" phone. But these arguments amount to "non-reviewable credibility questions." *United States v. Whyte*, 795 F. App'x 353, 363–64 (6th Cir. 2019). Tempo also argues that there were no phone records produced for either Odish's phone or Yako's phone that evening. This is simply incorrect. Evidence showed that Odish's phone had "seven contacts" with the x3399 "Polo" number on February 20, 2016. (Witt Test., R. 726, Page ID #6393).

Finally, Tempo argues that "because Yako injected Xanax all day long on February 20, 2016, that drug could have independently caused" her overdose. (Def. Tempo Br. at 31). Yako admitted that she used Xanax that day, but the jury was entitled to credit Dr. Mills' conclusion that Yako's positive reaction to Narcan "shows that it was an opioid intoxication," and that

"[t]here was no other explanation for [her reaction to Narcan]."  (Mills Test., R. 703, Page ID #3865).  The jury could have concluded that this evidence established but-for causation despite Yako's Xanax use.  *See United States v. Smith*, 656 F. App'x 70, 74 (6th Cir. 2016) (finding sufficient evidence of but-for causation when victim had "numerous substances in her body, including a lethal dose of oxycodone," which was the drug the defendant allegedly distributed).

ii.  Count 4: David Grzywacz

Sufficient evidence supported the jury's conclusion that Grzywacz overdosed on drugs he bought from "Polo."  Grzywacz called the x5598 "Polo" number eight times on the day he overdosed.  He used the drugs right away, and the next thing he remembers is waking up in the ambulance.  When the paramedics arrived, he was taking only four breaths per minute, which is not life-sustaining.  Paramedics administered Narcan, and Grzywacz's breathing immediately improved.  Dr. Mills testified that his medical condition was consistent with an opioid overdose and that he likely would have died without medical intervention.

Again, Tempo asks us to discredit Grzywacz's testimony because he is "a twice convicted felon," he is a "daily heroin user," and he seemingly received a lesser sentence in his own criminal case after he cooperated against Tempo.  (Def. Tempo Br. at 31).  Again, we do not entertain such credibility arguments.  *See Emmons*, F.4th at 616.  Tempo also highlights that Grzywacz "us[ed] the same syringe for over a month" to inject drugs.  (Def. Tempo Br. at 32).  He thus argues that "[t]here was no way to determine if residue of prior uses of other drugs remained in the syringe barrel or needle, and if they contributed to [Grzywacz's] overdose."  (*Id.*)  We generally reject these kinds of arguments as mere "speculative possibilities already rejected by the jury."  *United States v. Assfy*, — F. App'x —, No. 20-1630, 2021 WL 2935359, at *6 (6th Cir. July 13, 2021) (quoting *United States v. Simer*, 835 F. App'x 60, 65–66 (6th Cir. 2020)).  But, even if residue from other drugs got mixed up in the needle, that finding does not preclude but-for causation, which is met "where use of the controlled substance 'combines with other factors to produce'" the overdose.  *Volkman*, 797 F.3d at 392 (quoting *Burrage*, 571 U.S. at 211).

iii.  Counts 5 & 7: Jennifer Pointer

A rational jury could similarly conclude beyond a reasonable doubt that Pointer overdosed on drugs she bought from "Polo" on both March 17 and March 30, 2016.  Pointer testified that she bought heroin from "Polo" at the intersection of Bradford Avenue and Bringard Drive on the day of her first overdose—March 17, 2016.  She went home and snorted an entire $20 bag of heroin with her boyfriend.  She testified that she did not buy drugs from any other dealer that day, and she did not use any other drugs.

Paramedics arrived and found Pointer unresponsive and barely breathing with drug paraphernalia around her.  They administered two doses of Narcan, and Pointer became responsive after the second dose.  At the hospital, doctors administered a urine drug screen, which was positive for opiates and cocaine.  Dr. Mills testified that Narcan would only have been effective if Pointer had overdosed on opiates; it would not have reversed a cocaine overdose.  Dr. Mills concluded that Pointer's March 17, 2016, overdose was consistent with a heroin or fentanyl overdose and that, without medical treatment, it was "[m]ore likely than not [that] she would have died."  (Mills Test., R. 703, Page ID #3873).  Tempo argues that Pointer was also taking Adderall and Suboxone at the time, which "alone could have caused her overdose."  (Def. Tempo Br. at 32–33).  He further argues that Pointer's urinalysis drug test was "not reliable."  (*Id.* at 33).  But—for the same reasons as discussed above with Yako and Grzywacz—a rational jury could find that the urinalysis results, along with Dr. Mills' testimony, demonstrated that the "Polo" drugs were the but-for cause of Pointer's overdose.  *See Volkman*, 797 F.3d at 392.

On March 30, 2016, Pointer reported using Boose's phone to call the x3399 "Polo" number.  Phone records confirm that Boose's phone called the x3399 number three times that day.  Initially, police and paramedics arrived to treat Boose for an overdose.  When police arrived, Pointer was still conscious.  Police searched Pointer and found "a small fold paper, which is consistent with the packaging for heroin."  (Steiber Test., R. 717, Page ID ##5504–06).  Officer Steiber seized the substance, and test results concluded that it was 0.028 grams of pure fentanyl, which is "nine to ten times the lethal dose of fentanyl to your average adult."  (Mills Test., R. 703, Page ID #3877).  After Steiber handcuffed Pointer and put her in the back seat of the squad car, she fell unconscious.  Paramedics administered two doses of Narcan, and after the

second dose, Pointer became responsive.  Pointer's urinalysis tested positive for amphetamine, cannabinoids, and cocaine—but not opiates.  Even so, Dr. Mills testified that Pointer's responsiveness to Narcan indicated that she had overdosed on opioids and that, unlike heroin, fentanyl "is not detected by that particular [urinalysis] drug screen."  (Mills Test., R. 703, Page ID ##3874–75, ##3877–78).  He testified that the cocaine and amphetamines "played no role" in her overdose.  (*Id.* at Page ID #3878).  He said that her medical condition was "consistent with an opioid poisoning" and that, without medical attention, "she could have died."  (*Id.* at Page ID #3875, #3878).

Tempo points to the physical evidence to prove that Pointer's second overdose did not involve drugs from "Polo."  He alleges that, because Pointer's drugs were in a folded piece of paper, and not a small plastic bag like those used in all "Polo" sales, the drugs likely came from another source.  But Pointer testified that she bought the heroin from "Polo" in a small plastic bag.  She then took it out of the bag, placed it into a piece of paper, crushed it up, and snorted it out of the piece of paper.  While Pointer did make some inconsistent statements about her practice of repacking her drugs into paper folds, the jury was justified in crediting her testimony that she bought drugs from "Polo" and repackaged them into a paper fold.  For the same reasons as discussed above, Pointer's positive drug test for cocaine does not preclude but-for causation. *See Volkman*, 797 F.3d at 392.  Indeed, Dr. Mills testified that the cocaine and amphetamines "played no role" in her overdose.  (Mills Test., R. 703, Page ID #3878).

### iv.  Count 6: Anoosh Baghdassarian

Finally, sufficient evidence supported the jury's conclusion that "Polo" drugs caused Baghdassarian's death.  Baghdassarian died on March 30, 2016.  The medical examiner who conducted the autopsy concluded that Baghdassarian died of a fentanyl overdose.  Paramedics found Baghdassarian in her room at her mother's house with drug paraphernalia around her. Paramedics attempted to revive her with Narcan, but they were unsuccessful, and the doctors declared her dead when she arrived at the hospital.  The blood toxicology report showed eleven nanograms of fentanyl per milliliter and fifteen nanograms of alprazolam (Xanax) per milliliter. The Xanax dosage was at a safe, therapeutic level, whereas Baghdassarian's fentanyl levels were three times higher than a fatal dose of three nanograms.

There is also sufficient evidence for a jury to conclude that Baghdassarian overdosed on fentanyl from "Polo." Tomic testified that, on March 29, 2016—the evening before Baghdassarian died—he drove to Baghdassarian's house, she came outside and got into Tomic's car, they called "Polo," and they bought drugs somewhere near Six Mile Road. Baghdassarian took her share of the drugs inside her house without using any while in Tomic's car. That was around 3:30 or 4:30 p.m. on March 29. Baghdassarian's mother testified that she saw Baghdassarian meet with Tomic in his car and that, for the rest of that evening and the following morning, she never saw Baghdassarian leave the house or meet with anyone else. Later that night, police stopped Tomic and arrested him for drug possession. The police seized the drugs that Tomic bought with Baghdassarian, and lab results showed that they were pure fentanyl. Even though Tomic thought they bought heroin, "Polo" occasionally sold pure fentanyl to unknowing customers. Based on these facts, a rational jury could have concluded that Tomic and Baghdassarian purchased drugs from "Polo" and that those drugs caused Baghdassarian's overdose the next morning.

Tempo argues that the government "failed to show that [Baghdassarian] obtained the heroin from the Polo group." (Def. Tempo Br. at 33). First, he notes that Baghdassarian's last contact with a "Polo" phone was on February 14, 2016, and Tomic's last contact was on March 6, 2016. However, sometimes Baghdassarian used a phone application ("app") to contact "Polo," and contacts through an app would not appear on the phone records. The jury could have inferred that the significant history of phone contacts between Baghdassarian, Tomic, and the "Polo" phones—amounting to over 1000 contacts—showed a pattern of using "Polo" to obtain drugs and indicated that the two bought drugs from "Polo" on March 29, just as Tomic said they did. Furthermore, while there are discrepancies between Tomic's and Baghdassarian's mother's testimony as to when Tomic bought the drugs and whether Baghdassarian went with him, the jury could have weighed the evidence and concluded beyond a reasonable doubt that Baghdassarian died after overdosing on drugs that she and Tomic bought from "Polo."

3. <u>Drug Possession with Intent to Distribute Near a School</u>

Both Defendants argue that there was insufficient evidence to support their drug possession convictions under 21 U.S.C. §§ 841 and 860. Section 860 doubles the penalties for

certain drug crimes that occur within 1000 feet of a school. § 860(a). Defendants were charged with possessing cocaine and heroin at 19504 Strasburg. On June 14, 2016, officers searched that property and found 16.7 grams of cocaine, 138.3 grams of crack cocaine, razor blades, a digital scale, and plastic bags with a white powder residue. Neither Defendant contests that 19504 Strasburg is within 1000 feet of a school. Therefore, the question is whether each Defendant committed the underlying drug crime—possessing a controlled substance with intent to distribute—while at this property.

The underlying offense requires proof that the defendant: "(1) knowingly, (2) possessed a controlled substance, (3) with intent to distribute it." *United States v. Russell*, 595 F.3d 633, 645 (6th Cir. 2010) (quoting *United States v. Coffee*, 434 F.3d 887, 897 (6th Cir. 2006)). "[T]he government need not have provided evidence of actual possession; proof of constructive possession suffices." *United States v. Welch*, 97 F.3d 142, 150 (6th Cir. 1996) (citing *United States v. White*, 932 F.2d 588, 589 (6th Cir. 1991)). "Constructive possession requires that a person knowingly have power and intention to exercise control over an object." *United States v. Critton*, 43 F.3d 1089, 1096 (6th Cir. 1995) (citing *United States v. Craven*, 478 F.2d 1329, 1333 (6th Cir. 1973)). Control over the substance can be "either directly or through others." *Welch*, 97 F.3d at 150 (quoting *United States v. Reeves*, 794 F.2d 1101, 1105 (6th Cir. 1986)). However, "proof of the 'mere presence' of the defendant in proximity to the controlled substance, by itself, is insufficient evidence to establish possession with intent to distribute beyond a reasonable doubt." *Id.* (quoting *White*, 932 F.2d at 589–90).

### a) Demarco Tempo

A rational jury could have found beyond a reasonable doubt that Tempo possessed these drugs with the intent to distribute. This case is similar to *Welch*, where we upheld a distribution conviction because "[t]here was extensive evidence of [the defendant's] involvement in a conspiracy to distribute cocaine and specifically his having sold cocaine from a [specific] crack house." 97 F.3d at 150. Here, 19504 Strasburg was a suspected "stash location" for "Polo" operations, and it operated "almost like a dispatch center." (Bankowski Test., R. 708, Page ID #4357). Although 19504 Strasburg appeared to be vacant, Tempo exerted some control over the property. He hired William Dennis to do repairs on the house. While working there, Dennis saw

people cutting up drugs, measuring them, and placing them in small plastic bags. Several witnesses saw Tempo at the property with other known "Polo" members and large quantities of drugs. While at the property, Tempo answered his phone and told runners to go meet customers.

This evidence sufficiently shows that Tempo constructively possessed the substances found at 19504 Strasburg. *See United States v. Sheppard*, 149 F.3d 458, 462 (6th Cir. 1998) (upholding conviction under constructive possession theory when, among other facts, the defendant "was seen several times at the house in which the drugs were found" and "a large number of people were seen coming and going from the house"); *United States v. Hill*, 142 F.3d 305, 311–12 (6th Cir. 1998) (finding constructive possession with intent to distribute when drugs were found in large quantities along with items like scales, razor blades, packaging materials, and the defendant's own possessions); *Wettstain*, 618 F.3d at 586 (finding possession with intent to distribute when the defendant "receive[d] a phone call" and directed another person to retrieve the drugs to make a sale).[8]

### b) Kenneth Sadler

The government's only argument in support of the jury's guilty verdict against Sadler is that Sadler is liable as a co-conspirator under *Pinkerton*. "The doctrine holds that a member of a conspiracy is liable for 'substantive offense[s]' committed by his co-conspirators, even if he did not participate in them, as long as: (1) the offenses are 'done in furtherance of the conspiracy,' (2) they 'fall within the scope of the unlawful project,' and (3) they are reasonably foreseeable 'consequence[s]' of the unlawful agreement.'" *Hamm*, 952 F.3d at 744 (quoting *Pinkerton*, 328 U.S. at 647–48).

As discussed above, Sadler was a co-conspirator in the "Polo" operation. *See supra* Part II.A.1.b. Sadler also had ties to the Strasburg property; police surveillance showed Sadler coming and going from the house between May and June 2016. Based on Sadler's status

---

[8]As each of Tempo's Rule 29 challenges fails, his argument that the district court erred in denying his motion for a new trial under Rule 33 also fails. Federal Rule of Criminal Procedure 33 provides that, "[u]pon the defendant's motion, the [district] court may vacate any judgment or grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. Here, Tempo's Rule 33 motion presented the same arguments as his Rule 29 motion. Because his Rule 29 arguments fail, so to do his Rule 33 arguments, even under Rule 33's different standard. *See United States v. Bowens*, 938 F.3d 790, 796 (6th Cir. 2019).

as a co-conspirator, his presence at the Strasburg property on multiple occasions, and the evidence discussed above about drug activity at the house, there was sufficient evidence for the jury to conclude that possession with the intent to distribute at 19504 Strasburg was a foreseeable crime within the scope of and in furtherance of the conspiracy. Thus, Sadler is liable for this substantive offense under *Pinkerton*. *See Martin*, 920 F.2d at 348–49.

4. Felon in Possession

Sufficient evidence supports Sadler's conviction under 18 U.S.C. § 922(g)(1) for being a felon in possession of a firearm. "The elements of the crime of being a felon in possession of a firearm are: 1) a prior felony conviction; 2) knowing possession of a firearm; and 3) the firearm must have traveled in interstate commerce." *United States v. Mayberry*, 540 F.3d 506, 514 (6th Cir. 2008) (citing 18 U.S.C. § 922(g)(1)). Sadler does not dispute that he is a convicted felon or that the gun he allegedly possessed travelled in interstate commerce. Thus, if a reasonable jury could find, beyond a reasonable doubt, that Sadler possessed the firearm at issue, his conviction will stand.

"Possession may be 'either actual or constructive and it need not be exclusive but may be joint.'" *United States v. Paige*, 470 F.3d 603, 610 (6th Cir. 2006) (quoting *United States v. Covert*, 117 F.3d 940, 948 (6th Cir. 1997)). "Constructive possession may be proved by direct or circumstantial evidence and it is not necessary that such evidence remove every reasonable hypothesis except that of guilt." *Coffee*, 434 F.3d at 895–96 (citing *Craven*, 478 F.2d at 1333). "Proof that 'the person has dominion over the premises where the firearm is located' is sufficient to establish constructive possession." *Id.* at 896 (quoting *United States v. Kincaide*, 145 F.3d 771, 782 (6th Cir. 1998)). "However, presence where a firearm was found, without more, is insufficient to establish 'knowledge, power, or intention to exercise control' over the firearm." *Id.* (quoting *United States v. Arnold*, 434 F.3d 396, 403 (6th Cir. 1993)).

The government charged Sadler with possession of a .40 caliber Smith & Wesson handgun found on June 15, 2016, during a search of 15652 Eastburn. Police saw Sadler leaving that house earlier that day. Sadler's children lived at the home with their mother, and police found some of Sadler's belongings in the house. Police found the firearm on the top shelf of a

kitchen cabinet.  A forensic scientist identified Sadler's DNA on the firearm.  After his arrest, Sadler told police that "he was taking full responsibility for the firearm . . . that w[as] found in the residence on Eastburn Street."  (John Pickett Trial Test., R. 706, Page ID #4208).  Even without unequivocal evidence that Sadler owned or resided at the Eastburn property full-time, this evidence is sufficient to establish constructive joint possession.  *See Coffee*, 434 F.3d at 896–97 (finding constructive possession despite conflicting testimony about the defendant's primary residence at the time of the search).

### 5. Conspiracy to Obstruct Justice

Sufficient evidence supported Sadler's conviction for conspiring to obstruct justice. Under 18 U.S.C. § 1512, it is a crime to conspire to use "the threat of physical force against any person . . . with intent to . . . influence, delay, or prevent the testimony of any person in an official proceeding."  § 1512(a)(2)(A), (k).  The government charged Sadler with conspiring to threaten William Dennis.  To sustain this conviction, Sadler must have agreed with another person to threaten Dennis in hopes of preventing or influencing his testimony at trial.  Although the government's evidence on this charge is circumstantial, that does not preclude the jury from finding Sadler guilty beyond a reasonable doubt.  *See United States v. Ledbetter*, 929 F.3d 338, 355 (6th Cir. 2019) (upholding conviction for conspiracy to obstruct justice based on circumstantial evidence alone).  There are three key pieces of evidence here:  Sadler found out who would be testifying against him at trial;[9] Sadler and his mother then called Dennis' mother—Francine Leatherwood—and discussed Dennis' future testimony; and *immediately* after that call, an unknown person called Dennis' mother and said, "Tell William to shut up or one of y'all are going to go missing."  (Francine Leatherwood Test., R. 791, Page ID #7875).

Sadler argues that "there was absolutely no testimony from any witness, including William Dennis Sr., that Mr. Sadler ever threatened [Dennis] or directed anyone to threaten him."  (Def. Sadler 19-2221 Br. at 14).  "But that misses the point at this stage, where all inferences must be made in favor of the prosecution and the evidence need not 'exclude every reasonable hypothesis except that of guilt.'"  *Ledbetter*, 929 F.3d at 355 (quoting *Johnson v.*

---

[9]As discussed below, this evidence was admissible.  *See infra* Part II.B.2.

*Coyle*, 200 F.3d 987, 992 (6th Cir. 2000)).  A jury could infer intent based on the timing of the calls in relation to Sadler's discovery that Dennis would testify.  It could further infer an agreement to threaten Leatherwood with physical force by the back-to-back calls from Sadler and the threatening caller.  The timing of these events could have led the jury to conclude, beyond a reasonable doubt, that Sadler had agreed with the unknown caller to threaten Leatherwood with the use of physical force.

6.  Witness Tampering

A person commits a substantive offense under § 1512 when he or she "uses . . . the threat of physical force against any person, or attempts to do so, with intent to . . . influence, delay, or prevent the testimony of any person in an official proceeding."  18 U.S.C. § 1512(a)(2)(A).  The jury found Sadler guilty of tampering with two witnesses:  Dennis and Alexander.

*a)  William Dennis Sr.*

Sufficient evidence showed that Sadler used threats of physical force with the intent to influence or prevent Dennis' testimony in this trial.  After learning that Dennis would testify in this case, Sadler and his mother called Dennis' mother, asking whether she knew that her son was testifying and commenting on his decision to testify.  An unknown caller immediately called Leatherwood back and said: "Tell William to shut up or one of y'all are going to go missing." (Francine Leatherwood Test, R. 791, Page ID #7875).[10]  Around the same time, Sadler sent a Facebook message to Dennis' sister—Andrea Leatherwood—saying, "That's crazy how your brother are main witness, but we telling on him.  Little bro turn in his grave, that's how shit . . . ."  (Andrea Leatherwood Test., R. 791, Page ID ##7890–91).

Sadler argues that his statements were not threats and that, even if they were, there was no evidence indicating that Dennis found out about the threats.  First, his statements that Dennis would "turn in his grave" and that, if Dennis did not "shut up . . . [,] one of y'all are going to go missing" satisfy the threats-of-physical-force requirement.  *See United States v. Thompson*,

---

[10]Having concluded that this statement was made as part of a conspiracy, *see supra* Part II.A.5, Sadler would be liable for this substantive offense committed by a co-conspirator under the *Pinkerton* doctrine, *see supra* Part II.A.3.b.

758 F. App'x 398, 411–12 (6th Cir. 2018) (defendant's statement that "I'm going to get her," when referring to the witness, satisfied "threat" requirement).  Second, for purposes of § 1512 liability, it does not matter that Sadler made the threats to Dennis' family members, or that Dennis may not have heard about them.  The statute encompasses threats "against *any* person," *id.*, even if not made directly to the witness and the witness never learned of the threat, *see United States v. England*, 507 F.3d 581, 589 (7th Cir. 2007) (upholding conviction when the defendant threatened the witness's father even though the witness never heard about the threat).

### b)  Amacio Alexander

There is also sufficient evidence supporting the jury's finding that Sadler threatened Alexander.  On June 19, 2016, Sadler approached Alexander while Alexander was at his aunt's house.  Sadler drove up to the house in a black truck and, without getting out of the vehicle, approached Alexander and said, "Take back what you said.  Don't go to court or your family going to see your face on a T-shirt."  (Alexander Test., R. 705, Page ID #4064).  Alexander believed this was a reference to "memorial T-shirt[s]" and believed it was a death threat.  (*Id.*)  The geolocation data on Sadler's phone confirmed that he was near Alexander's aunt's house around the time of this incident.  Based on this evidence, a rational jury could have found that Sadler threatened Alexander with the intent to prevent him from testifying.

## B.  Evidentiary Objections

Sadler challenges the district court's decision to admit two pieces of evidence against him:  (1) evidence of two incidents where he sold heroin to an undercover police officer in 2012, and (2) his former attorney's testimony discussing when Sadler learned about the witnesses in this case.

### 1.  Sadler's 2012 Heroin Sales

We "generally review the district court's admission or exclusion of evidence for abuse of discretion."  *Emmons*, 8 F.4th at 473 (quoting *United States v. Bell*, 516 F.3d 432, 440 (6th Cir. 2008)).  "A district court has abused its discretion when its decision rests on the wrong legal standard, a misapplication of the correct standard, or on clearly erroneous facts."  *United States v. Gibbs*, 797 F.3d 416, 422 (6th Cir. 2015).  "If evidence was erroneously admitted, we ask

whether the admission was harmless error or requires reversal of a conviction." *United States v. Churn*, 800 F.3d 768, 775 (6th Cir. 2015) (citing *United States v. Martinez*, 588 F.3d 301, 312 (6th Cir. 2009)).  This standard applies when reviewing a district court's determination that Federal Rule of Evidence 404(b) is inapplicable because the evidence is intrinsic or *res gestae*. *Id.* at 774, 779.  Here, the district court abused its discretion by admitting evidence of two instances where Sadler sold drugs in 2012.  But, ultimately, the error is harmless.

Under Rule 404(b)(1), "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).  "The purpose of Rule 404(b) is to prevent a jury from 'convict[ing] a "bad man" who deserves to be punished not because he is guilty of the crime charged but because of his prior or subsequent misdeeds' and from 'infer[ring] that because the accused committed other crimes, he probably committed the crime charged.'"  *Emmons*, 8 F.4th at 473 (quoting *United States v. Phillips*, 599 F.2d 134, 136 (6th Cir. 1979)).

However, Rule 404(b) does not apply when the prior bad act forms the basis of the charges for which a defendant is being tried.  *See United States v. Adams*, 722 F.3d 788, 822 (6th Cir. 2013) (Rule 404(b) "is not implicated when the other crimes or wrongs evidence is part of a continuing pattern of illegal activity" (quoting *United States v. Barnes*, 49 F.3d 1144, 1149 (6th Cir. 1995))).  That is, if evidence is "intrinsic," Rule 404(b) will not apply as long as the acts "are part of a single criminal episode."  *Id.* (quoting *Barnes*, 49 F.3d at 1149).  "Intrinsic acts are those that are . . . a part of the criminal activity[,] as opposed to extrinsic acts, which are those that occurred at different times under different circumstances from the offense charged." *Churn*, 800 F.3d at 779 (quoting *United States v. Stafford*,  198 F.3d  248 (Table), 1999 WL 1111519, at *4 (6th Cir. 2012)).  A similar but distinct doctrine involves an exception to Rule 404(b) for *res gestae*, or background, evidence.  *See Adams*, 722 F.3d at 810 (citing *United States v. Clay*, 667 F.3d 689, 697 (6th Cir. 2012)).  Such evidence "consists of those other acts that are inextricably intertwined with the charged offense."[11]  *United States v. Hardy*, 228 F.3d

---

[11]We have not always been clear when distinguishing between *res gestae* and intrinsic evidence. *Adams* indicates that these concepts are different.  *See* 722 F.3d at 810, 822.  However, later cases have merged the two.

745, 748 (6th Cir. 2000). "Typically, such evidence is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of a witness's testimony, or completes the story of the charged offense." *Id.* "Concerned with the potential for abuse of background evidence as a means to circumvent Rule 404(b)," we have recognized "severe limitations as to 'temporal proximity, causal relationship, or spatial connections' among the other acts and the charged offense." *Adams*, 722 F.3d at 810 (quoting *Clay*, 667 F.3d at 698). We must be careful not to allow *res gestae* evidence as a "'backdoor to circumvent [the] goals' of Rule 404(b)." *Gibbs*, 797 F.3d at 423 (quoting *Clay*, 667 F.3d at 698).

Sadler believes the district court improperly admitted evidence relating to his 2012 heroin sales—which he does not dispute happened—as intrinsic evidence. The government alleges that these sales were evidence of the "Polo" conspiracy. The district court overruled Sadler's objection to this evidence and found that it was "relevant because it's certain acts alleged[ly] by the defendant . . . during the time frame of the conspiracy relating to the overall charge." (Trial Tr., R. 706, Page ID #4127). The district court did not consider whether the testimony was admissible under any exception to Rule 404(b), such as proof of motive, opportunity, intent, plan, knowledge, or lack of accident. *See* Fed. R. Evid. 404(b)(2).

The parties' dispute boils down to the degree of relatedness between Sadler's 2012 heroin sales and the broader "Polo" conspiracy between 2010 and 2016. The government argues that the jury could reasonably infer that these sales were *part of* the "Polo" conspiracy. It relies on the following threads to tie Sadler's 2012 sales to the broader "Polo" conspiracy: Sadler sold heroin; "Polo" sold heroin; Sadler sold heroin in small plastic bags; "Polo" sold heroin in small plastic bags; Sadler sold those bags for roughly $20; "Polo" sold bags for $20; Sadler used a phone to set up drug deals; "Polo" used phones to coordinate drug deals; Sadler's sales were in 2012; "Polo" allegedly operated in 2012. But, as Sadler notes, "[t]he similarities that the

---

*See Churn*, 800 F.3d at 779 ("*Res gestae* is sometimes also known as 'intrinsic evidence.'"). As we have recognized, "the distinctions among *res gestae*, inextricably intertwined evidence, intrinsic evidence, and background evidence [are] far from clear." *Id.* (quoting *Adams*, 722 F.3d at 822 n.26). Ultimately, we do not need to split hairs deciding whether this is "intrinsic" or "*res gestae*" evidence because under either theory, the outcome is the same.

government claims are unique, are actually so generic that [we] . . . give them no credence whatsoever." (Def. Sadler Reply Br. at 3).

The government's comparisons are flawed for several reasons. First, they do not indicate that the 2012 sales were intrinsic evidence that was "part of a single criminal episode." *Adams*, 722 F.3d at 822 (quoting *Barnes*, 49 F.3d at 1149). The evidence does not show that Sadler's sales were "Polo" sales. There is no evidence that Sadler set up the sales using either "Polo" phone, he did not use a runner, and the sales were in a different part of town than "Polo" sales. Sadler pulled up to the undercover officer in a car, driven by the mother of his children, with a child in the backseat. Officers did not see other cars waiting or other drug deals happening at the same time. Sadler's 2012 drug sales are thus not intrinsic evidence because they have no bearing on whether he agreed, knowingly joined, and participated *in the conspiracy*. *See Williams*, 998 F.3d at 728 (listing elements of conspiracy); *United States v. Peete*, 781 F. App'x 427, 434 (6th Cir. 2019) (noting that evidence is intrinsic if it "tends to logically prove *an element* of the crime charged" (emphasis added) (quoting *United States v. Till*, 434 F.3d 880, 883 (6th Cir. 2006))). Indeed, in a similar drug conspiracy case, we found evidence of the defendant's past drug sales inadmissible extrinsic evidence when the parties involved in those deals were not the alleged co-conspirators, and the prior sales did not "tend to establish the charged conspiracy itself." *United States v. Hardy*, 228 F.3d 745, 749–50 (6th Cir. 2000). Without some connection to the conspiracy itself, prior bad acts are not intrinsic to the alleged conspiracy even if the bad act is of the same kind alleged in the conspiracy charge. *See id.*

Second, the 2012 sales are not *res gestae* or background evidence. Although courts can admit such evidence even when the prior acts are not "identical" to those charged, the facts must be "closely related." *Churn*, 800 F.3d at 779 (quoting *United States v. Vincent*, 681 F.2d 462, 465 (6th Cir. 1982)). Here, Sadler's 2012 drug deals are not "closely related" to the "Polo" conspiracy. The spatial and temporal connections between "Polo" and Sadler's 2012 sales are tenuous at best. Most of the evidence at trial concerned "Polo" deals between 2015 and 2016. But even in the earlier "Polo" sales, the evidence showed a clear pattern of "Polo" using the same two phones and the same handful of locations. Although Sterling Heights is a suburb just east of Detroit, it is roughly ten miles away from the small area where "Polo" operated. The

2012 deals did not happen at a "Polo" stash house or other identifiable "Polo" hotspot like Hamburg Street or the intersection of Bringard and Bradford.  Rather, they were in a Meijer parking lot ten miles away.

We require a much stronger connection between the prior act and the conduct charged to support a finding that the past act was intrinsic or *res gestae* evidence.  *See Churn*, 800 F.3d at 779 (admitting evidence of a non-charged fraudulent transaction because that transaction was with the same victim and the fraudulent deals were set up around the same time, and thus it was evidence of "the very scheme alleged in the indictment"); *United States v. Hughes*, 562 F. App'x 393, 396 (6th Cir. 2014) (admitting "intrinsic" evidence showing that the defendant—who was charged with carjacking a Pontiac Sunfire—used a Sunfire to commit several robberies within three hours of the alleged carjacking).  The district court thus abused its discretion by admitting this evidence as intrinsic or *res gestae* evidence.  Because the 2012 sales are not relevant to the charged offense and do not provide any necessary background, the only inference that can be drawn from them is that Sadler's prior drug-dealing activity makes it more likely that he would join a conspiracy involving those types of crimes.  This is precisely the kind of inference that Rule 404(b) seeks to avoid.  *See* Fed. R. Evid. 404(b); *see also United States v. English*, 785 F.3d 1052, 1059 (6th Cir. 2015) (Clay, J., concurring) (noting that defendant's prior fraudulent conduct was not *res gestae* because it involved "discrete instances of fraudulent conduct constituting only gratuitous evidence of [the defendant's] propensity to commit fraud").

After seemingly concluding that Rule 404(b) was not implicated, the district court did not consider whether any exceptions to Rule 404(b) applied.  But we do not need to remand on this issue because the error in admitting evidence of Sadler's 2012 drug deals was harmless.  "[A]n error is harmless unless one can say, with fair assurance[,] that the error materially affected the defendant's substantial rights—that the judgment was substantially swayed by the error." *Gibbs*, 797 F.3d at 425–26 (quoting *Clay*, 667 F.3d at 700).  As discussed above, a rational jury could have found beyond a reasonable doubt that Sadler was guilty of conspiracy under § 846 even without considering the 2012 drug sales. *See supra* Part II.A.1.b.

2. Prior Attorney's Testimony

Sadler next argues that the district court erred by allowing his former attorney—Doraid Elder—to testify at trial because that testimony violated the attorney-client privilege. "[W]hether the attorney-client privilege applies is a mixed question of law and fact, subject to *de novo* review." *Automated Sols. Corp. v. Paragon Data Sys., Inc.*, 756 F.3d 504, 517 (6th Cir. 2014) (quoting *Reg'l Airport Auth. of Louisville v. LFG, LLC*, 460 F.3d 697, 712 (6th Cir. 2006)). "The purpose of attorney-client privilege is to ensure free and open communications between a client and his attorney." *Id.* (quoting *In re Grand Jury Subpoenas*, 454 F.3d 511, 519 (6th Cir. 2006)). "The burden of establishing the existence of the privilege rests with the person asserting it." *United States v. Dakota*, 197 F.3d 821, 825 (6th Cir. 1999). In deciding whether a communication is privileged, we have held that: "(1) [w]here legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection is waived." *Reed v. Baxter*, 134 F.3d 351, 355–56 (6th Cir. 1998). While this definition seemingly only applies to the client's statements, courts generally agree that an attorney's statements to a client can also fall within the privilege if that communication would reveal client confidences or legal advice. *See In re Grand Jury Procs.*, 616 F.3d 1172, 1182 (10th Cir. 2010). However, those communications are not protected "when an attorney conveys to his client facts acquired from other persons or sources." *Id.* (quoting *In re Sealed Case*, 737 F.2d 94, 99 (D.C. Cir. 1984)).

Elder testified that he gave Sadler the witness list in this case shortly before Sadler made threatening calls to Francine Leatherwood (Dennis' mother) and sent threatening messages to Andrea Leatherwood (Dennis' sister). The government sought to admit this evidence because the temporal proximity of these events circumstantially showed that Sadler intended to "influence, delay, or prevent the testimony of any person in an official proceeding" as required to prove witness tampering. The district court allowed Elder to testify, but limited Elder's testimony to the following issues: (1) whether Elder had conversations with Sadler between March 19 and 23, 2018; (2) whether Elder and Sadler met on March 23, 2018; (3) whether Elder

gave Sadler a witness list and the grand jury testimony transcript on that day; and (4) whether those materials identified cooperating witnesses. Whether these types of communications are privileged is a matter of first impression. We agree with the district court that the Seventh Circuit's decision in *United States v. Defazio*, 899 F.2d 626 (7th Cir. 1990), is instructive here.

> In *Defazio*, the defendant was charged with tax fraud. During the course of the IRS's pre-indictment investigation, the defendant's attorney met with IRS agents to discuss his audit. [899 F.2d] at 634. The agents told the attorney that the IRS "had completed their investigation and are ready to refer the case [for prosecution] and that if you have any defenses you would like to present, he would be glad to listen to them." *Id.* Later, the attorney met with the defendant to discuss his meeting with the IRS, and the fact that criminal prosecution was likely. *Id.* After this discussion, the defendant transferred assets, for nominal consideration, to a newly created corporation. *Id.*

> The Government sought to prove that the transfers were part of the defendant's willful attempt to evade income taxes by calling the attorney to testify "only to what the IRS agent said to him, and that he later relayed those statements to [the defendant]." *Id.* at 635. The trial court allowed the attorney to testify to this effect, and the defendant appealed. The Seventh Circuit upheld the trial court's decision, concluding that "the content of [the attorney's] testimony is unprivileged because it did not reveal, either directly or implicitly, legal advice given [to the defendant] or any client confidences." *Id.* Accordingly, allowing the attorney to testify as to what the IRS agent told him, and that he later relayed the IRS agent's statements to the defendant, did not violate attorney-client privilege.

(Dist. Ct. Order, R. 653 at 5–6). As the district court noted, Elder's testimony did not disclose the contents of any meetings or conversations with Sadler beyond those facts that the government relayed to Elder. "Like the IRS statements in *Defazio*, this information did not reveal either directly or implicitly, legal advice or any client confidence." (*Id.* at 6). Elder's testimony merely indicated when Sadler received specific types of information from the government—vis-à-vis his attorney—about the case. In this context, the communications are not protected by the attorney-client privilege.

## C. Jury Instructions

Both Defendants argue that the district court made multiple errors in its jury instructions concerning 21 U.S.C. § 841(b)(1)(C)'s death-or-injury-results provision. That provision imposes an enhanced sentence if a defendant is found guilty of distributing, or conspiring to distribute, a

controlled substance and "death or serious bodily injury results from the use of such substance." § 841(b)(1)(C). Whether death or serious bodily injury results from a particular substance is a question for the jury. *Burrage*, 571 U.S. at 210.

We generally "review the legal accuracy of jury instructions *de novo*." *United States v. Pritchard*, 964 F.3d 513, 522 (6th Cir. 2020) (citing *United States v. Roth*, 628 F.3d 827, 833 (6th Cir. 2011)). However, "a district court's refusal to give an instruction requested by the defendant must amount to abuse of discretion in order for [us] to vacate a judgment." *Id.* (citing *Roth*, 628 F.3d at 833). If the defendant failed to request a specific instruction from the district court, we review that omission for plain error. *United States v. Semrau*, 693 F.3d 510, 527 (6th Cir. 2012) (citing *United States v. Carmichael*, 232 F.3d 510, 523 (6th Cir. 2000)). Even if the district court plainly erred, the error must have "affected substantial rights," meaning that we will not reverse or vacate a decision unless the error "affected the outcome of the district court proceedings." *United States v. Castano*, 543 F.3d 826, 833 (6th Cir. 2008) (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)).

Neither Defendant raised the precise objections that they now raise on appeal. Arguments challenging the district court's jury instructions are properly preserved when the defendant "objected to [the] jury instructions on [the same] ground in the trial." *United States v. Blackwell*, 459 F.3d 739, 764 (6th Cir. 2006) (internal citation omitted) (citing *Carmichael*, 232 F.3d at 523). Before the district court, Tempo objected to two jury instructions concerning causation and *Pinkerton* liability related to the death-or-injury results enhancement. However, he did not ask for the specific instructions that he now alleges the district court improperly omitted. Sadler similarly argues that the death-or-injury results instruction used the wrong causation standard and omitted an element of that enhancement. Sadler claims that "[t]his was objected to in a timely manner by . . . his attorney." (Def. Sadler 19-2217 Br. at 43). But he does not cite any part of the record showing that his attorney lodged these objections, and we have found none. Thus, neither Defendant properly preserved these objections. Because Defendants argue that the district court improperly omitted necessary instructions, but neither Defendant requested those specific instructions at trial, we review the instructions for plain error. *See Semrau*, 693 F.3d at 527 (citing *Carmichael*, 232 F.3d at 523).

1. Causation Instruction

The jury instructions correctly stated the causation standard under § 841(b)(1)(C). Both Defendants argue that the "results from" language requires a showing of proximate causation, which includes a foreseeability requirement. *See United States v. Jeffries*, 958 F.3d 517, 520 (6th Cir. 2020). Defendants thus argue that the district court erred by giving the following jury instruction:

> In determining whether the serious bodily injury or death of these individuals resulted from the use of Heroin of Fentanyl that was distributed, the government is not required to prove that the defendant or defendants knew ahead of time that the Distribution of a Controlled Substance would or could result in a serious bodily injury, or in the death of, these individuals. In other words, *the government need not prove that the serious bodily injury or death was foreseeable* to the defendant or defendants. . . .

> If you find that one or more of the defendants is guilty of the charged [offenses], you may find that the controlled substance so distributed caused a serious bodily injury or death if he or she would not have suffered that serious bodily injury or death if he or she not used that Substance. Along those lines, if you find that the substance distributed combined with other drugs or factors to produce his or her serious bodily injury or death, you may find that the substance caused the serious bodily injury or death of the victim if the victim would have avoided that serious bodily injury or lived *but for his or her use of that substance.* That is, you may find the substance distributed by the defendant caused a victim's serious bodily injury or death if, so to speak, this substance was the straw that broke the camel's back. But the government must prove beyond a reasonable doubt that the serious bodily injury or death would not have occurred had the substance distributed by the defendant not been ingested by the individual.

(Jury Instrs., R. 662, Page ID #3588–89 (emphasis added)). At trial, Tempo asked for an additional "superseding cause instruction." (Tempo Mot. for Jury Instr., R. 345, Page ID #1803). Sadler raises the argument for the first time on appeal. Because neither defendant specifically requested a proximate-cause instruction, we review this instruction for plain error. *See Pritchard*, 964 F.3d at 522 (citing *Roth*, 628 F.3d at 833).

There is no dispute that § 841(b)(1)(C) requires but-for causation. *Burrage*, 571 U.S. at 218–19. At the time of the trial, this circuit had not addressed whether the sentencing enhancement also required proximate causation. But we recently took up this question and decided that § 841(b)(1)(C) does not require a showing of proximate causation, including

foreseeability.  *Jeffries*, 958 F.3d at 520, 524; *see also United States v. Daniels*, 653 F.3d 399, 409 (6th Cir. 2011) (noting that the inquiry is whether the error was plain at the time of appellate review, not at the time of trial).  Thus, the district court properly instructed the jury on the applicable causation standard under § 841(b)(1)(C).

2. Chain of Distribution

Even if "Polo" drugs were the but-for cause of the victims' overdoses, Defendants argue that the jury was also required to find that they were personally linked to these drug sales in order to impose an enhanced sentence under 21 U.S.C. § 841(b)(1)(C).  The death-or-injury-results enhancement applies only if the defendant violated a substantive provision of § 841—that is, there must be an underlying crime.  *See* § 841(b)(1)(C).  When a defendant's underlying crime relies on a conspiracy theory of liability, then the district court cannot impose the enhanced sentence unless the jury finds that the defendant was part of the distribution chain that led to the victim's overdose.  *Hamm*, 952 F.3d at 745.  This rule emerged through two cases: *United States v. Swiney*, 203 F.3d 397 (6th Cir. 2000) and *United States v. Hamm*, 952 F.3d 728 (6th Cir. 2020).

In *Swiney*, nine co-defendants were convicted of conspiring to distribute heroin under § 846.  203 F.3d at 400.  One unindicted co-conspirator sold heroin to a man who later overdosed on that heroin.  *Id.* at 400–01.  The district court refused to apply the death-or-injury-results enhancement to the conspiracy defendants because there was "no proof linking the heroin which caused" the overdose to other co-conspirators, and we affirmed.  *Id.* at 401.  We concluded that "before any of the [d]efendants can be subject to the sentence enhancement of 21 U.S.C. § 841(b)(1)(C)" the jury must find that the defendants were "part of the distribution chain."  *Id.* at 406.  We vacated the defendants' sentences and remanded the case for the district court to make this factual determination.  *See id.*

In *Hamm*, we reiterated that "to apply the § 841(b)(1)(C) sentencing enhancement" to any underlying conspiracy crime, "the jury need[s] to find beyond a reasonable doubt that [the defendant] w[as] part of the distribution chain."  952 F.3d at 747.  But *Hamm* also extended *Swiney*, applying the chain-of-distribution requirement when the underlying crime is a

substantive offense under § 841 that is based solely on a conspiracy *theory*, even if the underlying crime is not conspiracy under § 846. 952 F.3d at 746–47. Specifically, *Hamm* held that a defendant who did not personally commit the underlying crime, but who is nevertheless liable as a co-conspirator, cannot be sentenced under the death-or-injury-results enhancement unless he was part of the chain of distribution. *Id.* Such co-conspirator liability, known as "*Pinkerton* liability," "is a way of holding members of a conspiracy liable 'for acts committed by other members.'" *Id.* at 744 (quoting Kumar Katyal, *Conspiracy Theory*, 112 Yale L.J. 1307, 1336 (2003)).

In *Hamm*, the defendants were convicted of distribution charges under § 841. *Hamm*, 952 F.3d at 746–47. The two defendants worked together with another woman, Tracey Myers, to buy carfentanil in Cincinnati and bring it back to Kentucky. *See id.* at 748. But, once in Kentucky, Myers and the two defendants each used or sold their carfentanil on their own terms. *See id.* At some point, Myers gave carfentanil to her cellmates while in jail, and her cellmates overdosed on the drugs. *Id.* The defendants were convicted of distributing carfentanil, and each received a 20-year sentence because the carfentanil caused Myers' cellmates' overdoses. *See id.* at 746–47. We concluded that, without the *Pinkerton* doctrine imposing liability onto co-conspirators, the defendants could not have been convicted under § 841(a). *See id.* at 747 ("No one is alleging that [the defendants] actually sold carfentanil to [the overdose victims]; they are only liable for the distribution to [the overdose victims] as . . . Myers' co-conspirators."). Because the defendants were only liable as co-conspirators, "it ma[de] little sense to say that *Swiney* [wa]s a conspiracy case but this one [wa]s not." *Id.* at 747. We thus held that the district court could not have imposed the sentence enhancement unless the jury found that the defendants were in the chain of distribution. *Id.* at 747; *see also Williams*, 998 F.3d at 734 ("To prove that [the defendant] was liable for the death of others, moreover, the government cannot rely on *Pinkerton* liability, and must show that [the defendant] was in the chain of distribution that caused the victim's death or injury."). But the jury was not instructed on this element. *See Hamm*, 952 F.3d at 747. By failing to give a chain-of-distribution instruction, the district court "misstated the law." *Id.*; *see also United States v. Nelson*, 27 F.3d 199, 200, 202 (6th Cir. 1994) (finding plain error when district court failed to instruct the jury on a critical element under a similar sentencing enhancement provision—18 U.S.C. § 924(c)(1)(A)). The district court here

did not give a chain-of-distribution instruction for either Tempo or Sadler. Because their underlying crimes were different, and the effects of any error differ, they require separate discussions.

### a) Kenneth Sadler: § 846 Conspiracy

The district court plainly erred by omitting a chain-of-distribution instruction as part of the jury instructions for Sadler's § 846 conspiracy count. The district court instructed the jury that:

> If you find that the defendant is guilty of the conspiracy charged in Count One, and that the distribution of Heroin or Fentanyl causing the serious bodily injury or death *was in furtherance of the conspiracy and was committed by or reasonably foreseeable to him*, you may find that the Heroin or Fentanyl so distributed caused a serious bodily injury or death if he or she would not have suffered a serious bodily injury or died had he or she not used that substance.

(Jury Instrs., R. 662, Page ID ##3574 (emphasis added)). Sadler did not object to this instruction or request a chain-of-distribution instruction before the district court. We therefore review this instruction for plain error. *See Castano*, 543 F.3d at 833.

The jury found that Sadler conspired to distribute controlled substances, that the substances distributed as part of that conspiracy resulted in death and serious bodily harm, and that those distributions were in furtherance of the conspiracy and reasonably foreseeable to Sadler. But the jury did not receive a chain-of-distribution instruction and, thus, did not decide whether Sadler was "part of the distribution chain" as required under *Hamm* and *Swiney*. *Hamm*, 952 F.3d at 745 (quoting *Swiney*, 203 F.3d at 406). Because the district court sentenced Sadler under the death-or-injury-results provision without the necessary factual findings by the jury, the district court plainly erred. *See Nelson*, 27 F.3d at 200, 202.

This error substantially affected Sadler's rights because, "taken as a whole, the jury instructions were so clearly erroneous as to likely produce a grave miscarriage of justice." *Castano*, 543 F.3d at 833. An erroneous jury instruction affects a defendant's substantial rights when it "could have led the jury to convict the defendant under a lower standard." *Id.* at 836. Here, the jury found that Sadler was part of the "Polo" conspiracy, but the jury did not consider

whether Sadler was "part of the chain of distribution" of the drugs that killed or injured the victims. Therefore, the district court improperly imposed the 20-year minimum sentence under § 841(b)(1)(C). *See Hamm*, 952 F.3d at 745; *see also United States v. Donovan*, 539 F. App'x 648, 653 (6th Cir. 2013) (vacating defendant's sentence because "[a] defendant may not be sentenced under the statutory penalties for a cocaine conspiracy following a general jury verdict on a conspiracy to distribute both cocaine and marijuana as the jury may have found only a marijuana conspiracy"). The chain-of-distribution instruction could have monumental effects for Sadler. Without the 20-year enhancement, Sadler's sentence would have been five years shorter. He is entitled to have a jury decide whether he was in the chain of distribution. Therefore, we vacate his sentence and remand on this question.

### b) *Demarco Tempo:* Pinkerton *Liability*

Tempo similarly argues that the district court improperly omitted a chain-of-distribution instruction. However, he believes that this instruction was necessary because the jury convicted him of substantive offenses under § 841 solely under a *Pinkerton* conspiracy theory. In its jury instructions, the district court explained that:

> There are multiple ways that the government can prove a defendant guilty [distribution under § 841]. The first is by convincing [the jury] that the defendant personally committed or participated in this crime. The second is by showing that the defendant aided and abetted the commission of the charged offense. The third is based on the legal rule that all members of a conspiracy are responsible for acts committed by the other members, as long as those acts are committed to help advance the conspiracy, and are within the reasonably foreseeable scope of the agreement. This is often called "Pinkerton Liability."

(Jury Instrs., R. 662, Page ID #3580). As to the death-or-injury-results enhancement on the substantive distribution counts, the court instructed that:

> [T]he government need not prove that the serious bodily injury or death was foreseeable to the defendant or defendants. Rather, the government must prove beyond a reasonable doubt that:
>
> > (A) The defendant is guilty of the charged Distribution of a Controlled Substance under *at least one of the theories of liability* described above;
> > (B) That the victim . . . used the Heroin of Fentanyl so distributed . . .;

(C) That he or she suffered a serious bodily injury or died; and

(D) That he or she would not have suffered a serious bodily injury or died but for the use of the Heroin or Fentanyl.

(*Id.* at Page ID ##3588–89 (emphasis added)).

At trial, Tempo objected to the *Pinkerton* instruction, but he did not ask for a chain-of-distribution instruction. Rather, he argued that the *Pinkerton* instruction was erroneous because "no conspiracy ha[d] been established" that involved Tempo. (Trial Tr., R. 727, Page ID #6626). The district court overruled that objection. Because Tempo lodged his objection to *Pinkerton* on different grounds than he now presents, we review the district court's omission of a chain-of-distribution instruction for plain error. *See Castano*, 543 F.3d at 833.

As *Hamm* made clear, the death-or-injury-results enhancement cannot apply if the defendant is convicted on a *Pinkerton* theory unless the jury also finds that the defendant was in the chain of distribution. *Hamm*, 952 F.3d at 745. Here, the district court gave a *Pinkerton* instruction but not a chain-of-distribution instruction on Tempo's substantive charges. Because the district court failed to instruct the jury that, *if it found Tempo liable under a Pinkerton theory*, it must *also* determine whether he was in the chain of distribution, the district court plainly erred.

Although Tempo argues that this error alone necessitates vacation and remand, such a remedy is warranted only if the error "affect[ed] substantial rights," meaning it "affected the outcome of the district court proceedings." *Castano*, 543 F.3d at 833 (quoting *Olano*, 507 U.S. at 734). Unlike Sadler's conspiracy conviction—and unlike the defendants in *Hamm* who could be found liable only on a *Pinkerton* theory—a rational jury could have found, beyond a reasonable doubt, that Tempo was a principal in the crime *and/or* an aider and abettor. *See supra* Part II.A.1.a. In this context, omitting a chain-of-distribution instruction did not substantially affect Tempo's rights because he "is not being held responsible for someone else's actions based on his status as a co-conspirator, but is being punished for his own actions." *Davis*, 970 F.3d at 657 (quoting *United States v. Atkins*, 289 F. App'x 872, 877 (6th Cir. 2008) (refusing to require a *Swiney/Hamm* instruction because the defendant was liable as a principal)). Thus, even though the district court plainly erred by omitting a chain-of-distribution instruction with the *Pinkerton* instruction, that error does not warrant remand. *See Castano*, 543 F.3d at 833.

**D.  Vagueness**

Finally, Tempo argues that the death-or-injury-results enhancement is unconstitutionally vague.  In whole, this provision provides that if a defendant violates § 841(a) by distributing schedule I or II controlled substances:

> if death or serious bodily injury results from the use of such substance [then the defendant] shall be sentenced to a term of imprisonment of not less than twenty years or more than life, a fine . . . , or both.

21 U.S.C. § 841(b)(1)(C).  The district court found that this provision was not unconstitutionally vague, and we review that decision *de novo*.  *United States v. Hart*, 635 F.3d 850, 856 (6th Cir. 2011) (citing *United States v. Suarez*, 263 F.3d 468, 476 (6th Cir. 2001)).  "Vagueness may invalidate a criminal statute if it either (1) fails 'to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits' or (2) authorizes or encourages 'arbitrary and discriminatory enforcement.'"  *United States v. Bowker*, 372 F.3d 365, 380 (6th Cir. 2004) (quoting *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999), *vacated on other grounds*, 543 U.S. 1182 (2005)).

Tempo first argues that § 841(b)(1)(C) is unconstitutionally vague because it "fails to specify" both an *actus reus* and a *mens rea*.  (Def. Tempo Br. at 40).  However, the *actus reus* is clear:  the sentencing enhancement applies to violations of § 841(a), which in turn proscribes possessing or distributing controlled substances.  *See* § 841(a)(1).  And we have held that the *mens rea* carries over from the underlying offense:  the enhancement applies only when a defendant "knowingly and intentionally" violates § 841(a)(1).  *Jeffries*, 958 F.3d at 522–23.  The only circuit to address this question found that § 841(b)(1)(C) is not vague for lack of a *mens rea*.  *United States v. Waldrip*, 859 F.3d 446, 451 (7th Cir. 2017); *see also United States v. Patterson*, 38 F.3d 139, 145 (4th Cir. 1994) (noting, without addressing vagueness, that § 841(b)(1)(C) "puts drug dealers and users on clear notice that their sentences will be enhanced if people die from using the drugs they distribute").  Therefore, the statute is not vague for lack of a *mens rea* or *actus reus* requirement.

Tempo next argues that the "or both" language—indicating that a defendant may face imprisonment, a fine, *or* both—is unconstitutionally vague.  On the one hand, the provision instructs that, if the drugs cause death or serious bodily injury, the defendant "*shall* be sentenced to a term of imprisonment of not less than twenty years." § 841(b)(1)(C) (emphasis added).  On the other hand, it allows courts to impose imprisonment, a fine, "*or* both." *Id.* (emphasis added). The word "or" would seemingly allow a court to bypass the mandatory minimum and apply only a fine.  Tempo argues that this "language is directly contradictory, and this lack of clarity . . . constitutes a notice deficiency, raising serious due process concerns." (Def. Tempo Br. at 41). But the Supreme Court has already addressed this discrepancy:

> Although this language, read literally, suggests that courts may impose a fine *or* a prison term, it is undisputed here that the "death results" provision mandates a prison sentence. Courts of Appeals have concluded, in effect, that the "or" is a scrivener's error.  The best evidence of that is the concluding sentence of § 841(b)(1)(C), which states that a court "shall not place on probation or suspend the sentence of any person sentenced under the provisions of this subparagraph *which provide for a mandatory term of imprisonment if death or serious bodily injury results*."

*Burrage*, 571 U.S. at 209 n.2 (internal citations omitted) (citing *United States v. Musser*, 856 F.2d 1484, 1486 (11th Cir. 1988) (per curiam)).  Any ambiguity in the "or both" language has thus been sufficiently clarified to put people on notice of the mandatory minimum. *See United States v. Lanier*, 520 U.S. 259, 267 (1997) (stating that the touchstone of notice is whether the statute is clear or whether courts have made clear that the statute prohibits the defendant's conduct).  Section 841(b)(1)(C) is not void for vagueness.[12]

---

[12]Tempo also argues that the death-or-injury-results enhancement is "facially overbroad," (Def. Tempo Br. at 41), but his argument is essentially a recitation of his vagueness arguments.  He argues that "[t]he statute on its face continues to leave our courts guessing as to what Congress intended, so surely it cannot be held to provide fair notice to a person of ordinary intelligence." (*Id.*)  However, "for a statute to be found unconstitutional on its face on overbreadth grounds, there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the court." *Hart*, 635 F.3d at 857 (quoting *Leonardson v. City of E. Lansing*, 896 F.2d 190, 195 (6th Cir. 1990)).  Tempo has not identified any protected conduct or otherwise indicated that the law cannot be applied constitutionally.  Thus, this argument lacks merit.

## III.  CONCLUSION

For these reasons, we **AFFIRM** Defendant Tempo's convictions and sentence, **AFFIRM** Defendant Sadler's convictions, but **VACATE** Defendant Sadler's sentence, and **REMAND** for a new trial on the sole question of whether Defendant Sadler was within the chain of distribution as required before imposing an enhanced sentence under 21 U.S.C. § 841(b)(1)(C).